Argued and submitted January 5, reversed and remanded March 28, 2012

In the Matter of K. P.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

S. P.,
*Appellant.*

Umatilla County Circuit Court
JV110070;
Petition Number JV110070A;
A149250

275 P3d 979

Erin K. Galli argued the cause for appellant. With her on the brief was Chilton & Galli, LLC.

Christina M. Hutchins, Senior Assistant Attorney General, argued the cause for respondent. On the brief were John R. Kroger, Attorney General, Anna M. Joyce, Solicitor General, and Laura S. Anderson, Senior Assistant Attorney General.

Before Haselton, Presiding Judge, and Armstrong, Judge, and Duncan, Judge.

ARMSTRONG, J.

## ARMSTRONG, J.

In this dependency case, the juvenile court asserted jurisdiction over parents' newborn child, K, on the basis that parents have conditions that prevent them from safely parenting the child. *See* ORS 419B.100(1)(c) (set out below).[1] Mother appeals from the jurisdictional judgment, arguing that (1) the court plainly erred in relying on two allegations as to father that "unfairly shifted the burden of production to father"; (2) the evidence regarding the allegations as to father is insufficient to support jurisdiction; and (3) "the evidence supports only some of the court's findings [as to mother] and those findings are insufficient to support a conclusion that the child is endangered." Father does not appeal. As explained below, we conclude that, under the circumstances of this case, mother's challenge to the jurisdictional allegations pertaining to father is properly before us; further, we agree with mother that the evidence is insufficient, as a matter of law, to support jurisdiction over K.[2] Accordingly, we reverse and remand.

In this case, "our task is to review the facts found by the juvenile court to determine whether they are supported by any evidence, and then to determine whether, as a matter of law, those facts together with facts implicitly found by the juvenile court, provide a basis for juvenile court jurisdiction under ORS 419B.100(1)(c)." *Dept. of Human Services v. C. Z.*, 236 Or App 436, 442, 236 P3d 791 (2010).[3] "Where findings are not made on disputed issues of fact and there is evidence from which those facts could be decided more than one way, we will presume that they were decided in a manner consistent with the juvenile court's ultimate conclusion." *State v. S. T. S.*, 236 Or App 646, 655, 238 P3d 53 (2010). We relate the facts consistently with that standard, supplementing our

---

[1] Although ORS 419B.100 was amended by the 2011 legislature, *see* Or Laws 2011, ch 291, § 5, those amendments have no bearing on our analysis in this case; we therefore cite to the current version of the statute throughout this opinion.

[2] As we explain below, *see* 249 Or App at 87 n 15, given that disposition, we need not address mother's unpreserved argument that the petition's framing of the allegations as to father improperly shifted the burden of proof away from the state.

[3] Mother does not ask that we exercise our discretion to review the case *de novo*, and we do not do so. *See* ORS 19.415(3)(b) (providing that *de novo* review is now discretionary in most dependency cases).

narrative with additional, uncontroverted facts from the record.

Mother was diagnosed as developmentally disabled as a young child and receives adult developmental disability services at the present time. Mother is eligible for 100 hours per month of services to assist her with daily living skills; she typically uses 50 hours of services per month. Berg, the person who provides case management services to mother in relation to her developmental disability, testified that the types of services that mother receives are based on the needs identified in her individual support plan and are "primarily up to her and her support team."

> "[Mother has] identified services in her home to help keep her home clean and safe, services to attend doctors' appointments, if needed.
>
> "If there's [*sic*] questions that she has, she can have her support staff go with her. Access to community resources such as WIC, CAPECO, things like that. Some of the recreational activities we do as a group she can be part of. And it really depends on what she needs at that time and what she's asking for of the services that we provide."

Berg testified that mother

> "in the past has generally had about 50 hours per month of support that she's requested. She likes to have support more outside of her home to do activities, and she has chosen primarily to be more independent in her home than to have a provider come in."

When asked her opinion "regarding [mother's] ability to take care of herself without the services provided by [her] organization," Berg, who has worked with mother in various capacities for a total of six years, replied:

> "[Mother] has done a fairly good job. She has often chosen to not have a provider for extended periods of time. She has managed to meet her Lifeways appointments. Her home—you know, she has food in her home, she is able to get her medications, things like that, and that she's done with the support system that she has. She's very able to access services and tell people when she needs support."

Berg explained that the services mother is eligible for "cannot go to provide support for another person," but "[w]hat we can do is provide support to [the eligible person] to learn the skills or to access services to be able to get those skills from somebody else."

Father suffers from an unspecified "seizure disorder" for which he takes medication. He receives Social Security disability payments, although it is unclear whether those payments are related to his seizure disorder. Father was in special education as a child. At some point, father applied for developmental disability services and was denied; he did not follow up with the additional testing that was required to determine his eligibility. Father is supportive of mother and recognizes that she needs services but, at times, he has had difficulty with some of the service providers who have been at the home.[4] In the month before K's birth, mother had not been receiving in-home services for approximately a month because of parents' difficulties with some of the service providers.

K was born on May 19, 2011, the first child for both mother and father. About eight hours after the birth, Anderson, a child protective services worker with the Department of Human Services (DHS), visited mother in the hospital.[5] Anderson observed mother with K for about one and one-half to two hours; she also talked to the doctor who provided medical care at K's birth and the nurses who were caring for mother and K. Mother had been given pain medication for childbirth and, as advised by her doctors, had not been taking during her pregnancy, the medications used to treat her disability.[6] During the visit, Anderson observed that mother had "a lot of difficulties and needed to be coached through the whole process" of wrapping K in a blanket. Anderson also observed that mother "easily gave up" when trying to feed K,

---

[4] The record shows that mother and father live together.

[5] DHS had received referrals that mother "was pregnant and was to deliver" a few months before.

[6] Anderson indicated that mother may have been started back on one of her regular medications after K was born, but the trial court did not attach any significance to that fact—perhaps because the record contains no evidence regarding what mother's regular medications were, their intended effects, or how long they must be taken before they become effective.

even after she was coached in "how to keep the baby engaged in the feeding process," and that the nurse eventually took the baby and finished feeding her. Mother similarly needed "constant coaching" in how to change the baby's diapers. Anderson further explained that,

> "[a]t one point[, as mother] was holding the baby, the baby's head was flopping to the side. They talked to her about how important it was to support the baby's head, and helped her to understand how important that was. She needed those reminders numerous times while she was holding the baby."

Anderson observed mother again the following day, for about an hour. However, she did not testify as to any concerns that arose during that visit.

Anderson also met with father the day that K was born, but she did not see father interact with K. Both mother and father acknowledged to Anderson that they lacked education and skills in caring for a newborn. Anderson later learned that they had received "some coaching [on] parenting" from Healthy Start before the birth of the baby. Mother and father identified family members and others as resources for them, but Anderson determined that none of those people was available to move into the home to assist parents in caring for K.

Based on Anderson's assessment, DHS took protective custody of K. The next day, as K was being discharged from the hospital to be placed in foster care, Anderson observed that "neither parent knew how to put the baby in the car seat and how to secure the baby in the car seat, and needed a lot of coaching on how to do that safely." Mother also indicated to Anderson that she thought K was already recognizing father's voice because K stopped crying when father yelled at her.

The state then filed a juvenile dependency petition alleging that K was within the court's jurisdiction on the ground that

> "the child's condition or circumstances are such as to endanger the child's welfare, to-wit:

"a.   The mother is developmentally delayed, has mental health concerns and requires the assistance of care providers to maintain the home and personal responsibilities.

"b.   The mother is not able to meet the basic needs of the child, due [to] her delays and medications.

"c.   The father has not presented himself as a parenting resource.

"d.   The father has mental health concerns, anger control issues, at times subjecting the mother to domestic violence.

"e.   The father has not demonstrated that he is able to provide the infant with the necessary care.

"f.   The home is unsafe and unsanitary for the child."

The jurisdictional hearing took place on July 6, 2011. During the period before the hearing, mother and father had two-hour visits with K three times per week. Corey, the DHS caseworker who was assigned the case after the dependency petition was filed,[7] observed parents with K during approximately five of those visits; each observation lasted "just maybe a couple [of] minutes."[8] Corey reported that parents "lacked just basic parenting skills." When asked to elaborate, she stated:

"For example, when I first viewed them when the baby was first—you know, one of the first visits, just basic [sic] how to hold the baby, to support the neck, and how important that is to, you know, to support her neck. She's got a very strong neck and she was really moving her head a lot, and so we had to work with the family a lot with that."

She also visited parents' home, talked with mother and father, and "just * * * observed where their developmental disabilities come into play and where that might be a concern for them to safely parent the child."

---

[7] The court indicated in the judgment that it had considered the testimony of Anderson, Berg, and Jones, a mental health therapist who evaluated father at the request of DHS, in making its decision. However, the court sustained an objection to Jones's testimony. Thus, we understand the court's reference to mean Corey, rather than Jones, as Corey was the only other witness who testified at the hearing.

[8] A different DHS worker was responsible for being in the room and assisting parents during the visits. That person did not testify at the jurisdictional hearing.

In closing arguments, mother and father each contended that the evidence was insufficient to establish jurisdiction as to them; mother further argued:

> "This is not a case where we have somebody who is disabled who has no support and poses a threat to the child, this is a situation where she is receiving services through the Brokerage. She has been receiving those services, and she has the assistance of the father, who has no disability on this record, and who is not incapable of helping her.

> "So they have significant resources. They also have a stepmother who has been very vocal and communicative with the agency and who can also help assist.

> "So on this record we don't have a lack of assistance, we have abundant assistance. What we really have is a rush to judgment about these parents because of disabilities and just an assumption and conclusion that they can't parent. And that's not adequate to take jurisdiction."

The court concluded that jurisdiction was warranted, explaining:

> "[B]ased on the credible evidence before the court, the court is going to take jurisdiction concerning the child, but not concerning the issue of domestic violence or the unsafe and unsanitary [condition] of the home. So that will be (A), (B), (C), and the amended (D),[9] and (E).

> "The plan is going to be to get the child returned to the home. I do have hope here that with mom getting back on her meds, or maybe she is right now, and DHS is going to continue to work with you, even in-home services to try to see if the child can be safely with you. The court has concerns right now, but I do have hope that it will work out, that the child can—that you can care for the child safely."

The court subsequently entered a judgment finding K within the jurisdiction of the court based on the allegations in paragraphs a through e of the amended petition, making K a ward of the court and placing her in the legal custody of DHS for

---

[9] The court had previously granted the state's motion to amend the allegation in paragraph d of the petition to delete the phrase "at times subjecting the mother to domestic violence." Thus, as found by the court, that paragraph states, "The father has mental health concerns, anger control issues."

continued placement in substitute care. As noted above, only mother appeals.

We begin with a discussion of the relevant statutory provisions. ORS 419B.100 governs the juvenile court's subject matter jurisdiction in dependency cases. In particular, as relevant in this case, ORS 419B.100(1)(c) establishes exclusive original jurisdiction in the juvenile court "in any case involving a person who is under 18 years of age and * * * [w]hose condition or circumstances are such as to endanger the welfare of the person or of others[.]" The requirements of ORS 419B.100(1)(c) are satisfied if, "under the totality of the circumstances, there is a reasonable likelihood of harm to the welfare of the child." *State ex rel Juv. Dept. v. Vanbuskirk*, 202 Or App 401, 405, 122 P3d 116 (2005) (citing *State ex rel Juv. Dept. v. Smith*, 316 Or 646, 652-53, 853 P2d 282 (1993)). To endanger the child's welfare, the condition or circumstances must create a current "threat of serious loss or injury to the child" and "there must be a reasonable likelihood that the threat will be realized." *Dept. of Human Services v. A. F.*, 243 Or App 379, 386, 259 P3d 957 (2011); *Dept. of Human Services v. D. M.*, 248 Or App 683, 686, 275 P3d 971 (2012) (formulations in *Smith* and *A. F.* "complement each other and correctly state the standard" for juvenile court jurisdiction under ORS 419B.100(1)(c)). The burden is on the state to prove facts sufficient to warrant jurisdiction. *Dept. of Human Services v. B. L. J.*, 246 Or App 767, 773, 268 P3d 696 (2011).

The statutes contemplate that ORS 419B.100(1)(c) brings *the child* whose condition or circumstances are as described in the statute within the jurisdiction of the court, *see, e.g.*, ORS 419B.809(1) (any person may file a petition alleging that a child is within the jurisdiction of the juvenile court under ORS 419B.100); ORS 419B.310(3) (facts alleging that a child is within the jurisdiction of the juvenile court under ORS 419B.100(1) must, unless admitted, be proved by a preponderance of competent evidence); ORS 419B.328(1) (court shall make child found to be within the jurisdiction of the juvenile court under ORS 419B.100 a ward of the court); ORS 419A.010(33) (defining "ward" to mean "a person within the jurisdiction of the juvenile court under ORS 419B.100"), and the courts also frame it in those terms, *see, e.g.*, *Smith*, 316 Or at 650 ("This court has not previously considered

what conditions or circumstances are such as to endanger the welfare of a child *over whom juvenile court jurisdiction is sought*." (Internal quotation marks and brackets omitted; emphasis added.)).[10] However, under ORS 419B.803(1), a juvenile court having subject matter jurisdiction under ORS 419B.100 generally also has personal jurisdiction over the *parents* of the child or ward.[11] Moreover, the court may order a parent to participate in treatment or training if the court finds "that treatment or training is needed by a parent to correct the circumstances that resulted in wardship or to prepare the parent to resume the care of the ward" and if "the participation is in the ward's best interests." ORS 419B.387.

A ward—that is, a child found to be within the jurisdiction of the juvenile court under ORS 419B.100—is subject to the juvenile court's jurisdiction until:

"(a)   The court dismisses the petition concerning the ward;

---

[10] As the cases also recognize, jurisdiction "over a child" under ORS 419B.100(1)(c) is often the result of the conduct, condition, or circumstances of one or both parents; thus, the courts sometimes refer to jurisdiction "as to" or "with respect to" a particular parent. *See, e.g., Dept. of Human Services v. B. B.*, 248 Or App 715, 728, 730, 274 P3d 242 (2012) (evidence was insufficient to establish grounds for jurisdiction with respect to the father or the mother); *Dept. of Human Services v. J. H.*, 248 Or App 118, 119, 273 P3d 203 (2011) (reversing judgment of jurisdiction "as to" the father, but otherwise affirming, where the evidence pertaining to the factual allegations against the father was legally insufficient to form a basis for jurisdiction but the mother had conceded jurisdiction based on her circumstances); *Dept. of Human Services v. D. S. F.*, 246 Or App 302, 313 n 5, 316, 266 P3d 116 (2011) (holding that the court erred in asserting jurisdiction over the children based on the father's conduct, but noting that the father "does not dispute that the court could take jurisdiction over the children based on mother's conduct").

[11] ORS 419B.803(1) provides:

"A juvenile court having subject matter jurisdiction has jurisdiction over:

"(a) A party, who has been served in the matter as provided in ORS 419B.812 to 419.839 to the extent that prosecution of the action is not inconsistent with the Constitution of this state and the Constitution of the United States;

"(b) A child under 12 years of age who is the subject of a petition filed pursuant to ORS 419B.100; and

"(c) Any other party specified in ORS 419B.875(1)."

ORS 419B.875(1)(a), in turn, specifies that "[t]he child or ward," ORS 419B.875(1)(a)(A), and "[t]he parents or guardian of the child or ward," ORS 419B.875(1)(a)(B), are among the parties to a proceeding under ORS 419B.100.

"(b) The court transfers jurisdiction over the ward as provided in ORS 419B.127, 419B.130 and 419B.132;

"(c) The court enters an order terminating the wardship;

"(d) A judgment of adoption of the ward is entered by a court of competent jurisdiction; or

"(e) The ward becomes 21 years of age."

ORS 419B.328(2). We note that jurisdiction and physical custody are separate concepts; the court may have jurisdiction under ORS 419B.100(1) "even though the child is receiving adequate care from the person having physical custody of the child." ORS 419B.100(2); *see also* ORS 419B.331 (court may place the ward under "protective supervision," including in the legal custody of the ward's parents, if the court determines to do so would be in the "best interest and welfare" of the ward); ORS 419B.337(1) ("When the court determines it would be in the best interest and for the welfare of a ward, the court may place the ward in the legal custody of [DHS] for care, placement and supervision.").

With those principles in mind, we turn back to mother's appeal. Before addressing the merits of mother's arguments, we first must address the state's contention that, because father has not appealed the jurisdictional judgment, the allegations pertaining to him contained in that judgment "are conclusively established" and mother may not challenge them. As explained below, under the circumstances of this case, particularly where the juvenile court's findings as to mother are dependent, at least in part, on the soundness of its findings as to father, we conclude that mother can challenge all of the jurisdictional findings on appeal, including those that pertain to father.[12]

In this case, the state's theory of jurisdiction as alleged in the petition is, essentially, that parents *in combination* are unable to safely parent K given their—and particularly, mother's—cognitive impairments. *State v. R. H.*, 237

---

[12] We need not consider whether the same result would obtain where the parents' circumstances are not so intertwined.

Or App 245, 251, 239 P3d 505, *rev den*, 349 Or 480 (2010) ("The allegations in a petition are viewed as a whole, with each one potentially conditioned or amplified by the others."). As the state explains, "mother and father both lack parenting skills and[,] potentially, the mental capacity to learn those skills without special assistance."[13] In short, the question before the juvenile court was whether the allegations regarding mother and father *together* were sufficient to prove that, in the totality of the circumstances, K's welfare was endangered.[14] *See, e.g.*, *B. L. J.*, 246 Or App at 773 ("[T]here is no legal requirement that a parent be able to care for his or her children independently."). Accordingly, the juvenile court properly considered parents as a unit in determining that jurisdiction under ORS 419B.100(1)(c) was warranted. As a result, on appeal, the sufficiency of the allegations as to mother are necessarily intertwined with the sufficiency of the allegations with respect to father. That is so because mother's ability to safely parent K must be evaluated in light of all of the circumstances, *Smith*, 316 Or at 652-53 (court must consider the totality of the circumstances in determining whether a child is endangered), and those circumstances necessarily include the participation of father in caring for K. And that, in turn, compels consideration on appeal of the sufficiency of the court's findings pertaining to father.[15]

We turn to those findings, the totality of which can be summarized as follows: father is not available as a parenting resource, he has mental health concerns and anger

---

[13] By "special assistance," we understand the state to mean assistance beyond what mother is eligible to receive from adult developmental disability services.

[14] That is how the case was understood by the parties and the court below. As described above, in closing, mother's counsel argued:

"This is not a case where we have somebody who is disabled who has no support and poses a threat to the child, this is a situation where she is receiving services through the Brokerage. She has been receiving those services, and she has the assistance of the father, who has no disability on this record, and who is not incapable of helping her."

[15] We emphasize that the allegations pertaining to father were fully litigated below. Thus, we express no opinion on the ability of one parent to challenge jurisdictional allegations that are *admitted* by the other parent. *See* ORS 419B.310(3) ("The facts alleged in the petition showing the child to be within the jurisdiction of the court as provided in ORS 419B.100(1), *unless admitted*, must be established by a preponderance of competent evidence." (Emphasis added.)).

control issues, and he is unable to provide K with the necessary care. Those findings are simply not supported by the record.[16] First, there is no evidence indicating that father is not a parenting resource for K. To the contrary, the record demonstrates that mother and father live together and are jointly parenting K: father was in the hospital the day that K was born; he was helping when K was discharged from the hospital; and he participated, with mother, in visiting K after she left the hospital and was placed in foster care.

Similarly, the record does not support a finding that father has current "mental health concerns." Rather, the evidence shows only that father was in "special education" as a child and that he applied for, *but was denied*, eligibility for developmental disability services.[17] The same is true of the court's finding that father has "anger control issues." Anderson testified that father "was not happy with" some of the people who provided in-home services to mother for her developmental disability and that mother and father at times did not allow service providers into the home; similarly, Berg testified that, "[a]t times[, father] has had difficulty with some of the providers that have been at the home." However, there is nothing in the record to indicate that father reacted angrily to those service providers, let alone that he had difficulty controlling his anger in that or any other setting. Mother also related to Anderson that the baby once stopped crying when father "yelled" at her; however, that, without more, is insufficient to evince an "anger control issue[ ]."

That leaves the court's finding that father is unable to provide K with the necessary care. The sole evidence in

---

[16] Mother also raises an unpreserved "facial" challenge to the allegations in paragraphs c and e of the petition, contending that they unfairly shifted the burden of production to father in violation of his due process rights. We need not address that argument, however, because we agree with mother's alternative argument that, even reading those paragraphs broadly as alleging, instead, that father is not available as a parenting resource (paragraph c) and not capable of providing K with the necessary care (paragraph e), "the evidence regarding the allegations as to father does not support a basis for jurisdiction."

[17] It is not apparent from the record that father's unspecified seizure disorder, or the fact that he takes medication for that condition, is a "mental health concern"; however, to the extent that the court relied on that evidence, without more information about father's condition, it is insufficient in any event to support a conclusion that there is a reasonable risk of harm to K as a result.

that regard is the following: Anderson observed that father did not know how to put the baby in a car seat when she was being discharged from the hospital the day after her birth and that he "needed a lot of coaching on how to do that safely." And, during one of the first visits with K after she was discharged from the hospital, DHS "had to work with the family a lot with" how to hold the baby and support her neck. That was the extent of it. As explained in more detail below in our discussion of the allegations pertaining directly to mother, that evidence cannot support the conclusion that K was exposed to a "reasonable likelihood of harm" as a result. In short, the state has failed to prove the jurisdictional allegations pertaining to father.

That said, we reject mother's categorical assertion that, if the factual allegations "as to" father are legally insufficient, jurisdiction necessarily fails regardless of any deficiencies that mother may have. As explained above, juvenile court jurisdiction under ORS 419B.100(1)(c) is predicated on the *risk* of harm to the child. *Vanbuskirk*, 202 Or App at 405 (jurisdiction under ORS 419B.100(1)(c) is warranted if "there is a reasonable likelihood of harm" to the child). Thus, even if the allegations as to father are unfounded, it does not necessarily follow that K could not still be at risk of harm—and thus under the court's jurisdiction—due to mother's condition or circumstances.

We turn, then, to the allegations relating to mother. We conclude, first, that there is evidence in the record to support the juvenile court's findings that mother is developmentally delayed, requires the assistance of care providers to live independently, and takes medications for her disability. However, as explained below, we also conclude that the court's finding that mother is "*not able* to meet [K's] basic needs" (emphasis added) is not supported by the record and that the evidence is insufficient, as a matter of law, to support the court's conclusion that, in the totality of the circumstances, there is a "reasonable likelihood of harm" to K's welfare.

We note that this case is made more difficult because the record contains very little evidence regarding the nature and extent of mother's disability. Specifically, the juvenile

court could discern from the evidence presented only that mother generally needs 50 hours of adult developmental disability services per month to assist her with daily living tasks—mostly outside of the home—and that she takes unspecified medications, the effects of which are also unspecified on this record. Beyond that, the record is devoid of evidence, expert or otherwise, regarding developmental disabilities in general or mother's mental capacity in particular, much less how that disability and the medication she takes for it might affect her ability to care for a newborn. Anderson testified that she spoke with the doctors and nurses caring for mother, "DD Services," and parents' extended family, but the record does not disclose the details of what that investigation yielded. Similarly, Corey testified that she visited parents' home, talked with mother and father, and "just * * * observed where their developmental disabilities come into play and where that might be a concern for them to safely parent the child." But, with the exception of a single incident discussed below, Corey did not relate any particular safety concerns that were identified.

Thus, the bulk of the state's evidence that mother lacks, and is unable to learn, the necessary parenting skills to safely parent a newborn consists of behavior observed by Anderson eight hours after mother had given birth to K and while she was taking medication for pain. Anderson testified that mother had difficulty learning how to wrap K in a blanket, change her diapers, and feed her, and that mother needed "a lot" of coaching in performing some of those tasks. Significantly, however, there is no evidence in the record that mother's difficulties with those skills persisted even into the next day, let alone at the time of the jurisdictional hearing several weeks later. The same is true of the state's evidence that, the day after K was born, mother and father needed coaching in how to safely secure K in a car seat. *See A. F.*, 243 Or App at 386 (reversing ground for jurisdiction based on the father's possession of pornography where the state failed to present evidence that there was a current risk of the children being exposed to pornography at the time of the hearing); *State ex rel Dept. of Human Services v. D. T. C.*, 231 Or App 544, 554-55, 219 P3d 610 (2009) (reversing judgment of jurisdiction where there was insufficient evidence that the

father's alcohol abuse problem created a reasonable likelihood of harm to the children at the time of the dependency hearing).

According to Anderson, parents had had some "coaching" concerning parenting before K was born; however, without further details as to the nature and extent of that interaction, it would be speculative to infer from that evidence that mother lacks the mental capacity to learn those skills.

Of greater concern is the evidence that mother failed to properly support K's head and neck while holding her. Unlike with mother's other perceived deficiencies, there is evidence that that behavior persisted—at least to some extent—after mother left the hospital. Anderson testified that, during her initial observation of mother on the day that K was born, mother needed reminders "numerous times while she was holding the baby" about how important it was to support the baby's head. Corey, who observed mother interact with K after K was placed in foster care, also testified that on one of the first visits, they had to "work with the family a lot with that." The difficulty with that evidence is that it lacks essential context. For example, with regard to Anderson's testimony, we cannot tell from the record if mother was holding the baby the entire visit, which lasted approximately two hours, or whether she was holding the baby only for a few minutes. Obviously if it were the latter, then the need for "numerous" reminders would be more of a concern. Corey's testimony indicates that the deficiency was observed at only one visit—indeed, only at one of the *first* visits parents had with K after leaving the hospital—and the record does not disclose how many days elapsed between mother's instruction at the hospital and that visit. We also emphasize that there is no evidence that the problem continued at the time of the hearing almost two months later. Our point is that, without those details—particularly when combined with the lack of evidence regarding mother's cognitive abilities generally—it is impossible to determine that mother lacks the capacity to learn the necessary skills without "special assistance," which is the theory upon which jurisdiction was based.

Moreover, the evidence is undisputed that mother is eligible for 100 hours per month in adult developmental disability services and that those services can be used to help mother "learn the skills or * * * access services to be able to get those skills from somebody else." The record further discloses that mother is "very able to access services and tell people when she needs support." Mother also has the assistance of father who, on this record, we have determined is not incapable of safely parenting K. We are not unmindful of K's particular vulnerability due to her extremely young age; however, considering all of the above circumstances, we conclude that the evidence is legally insufficient to support the trial court's finding that mother is "not able to meet the basic needs of the child, due [to] her delays and medications."

In sum, we conclude that the evidence is insufficient, as a matter of law, to support the trial court's ultimate conclusion that K's "condition or circumstances are such as to endanger [her] welfare." ORS 419B.100(1)(c). As we have recently emphasized, "the burden is on the state to show that harm is, in fact, present[,]" *C. Z.*, 236 Or App at 443, and the state failed to meet that burden here.

Reversed and remanded.