382

Argued and submitted March 7, judgment in A154075 reversed and remanded; order in A155310 reversed and remanded with instructions to enter an order setting aside the October 2012 judgment June 4, 2014

In the Matter of H. C.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

W. A. C.,
*Appellant.*

Washington County Circuit Court No. J120453;
Petition No. 01J120453M;
A154075

In the Matter of M. C.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

W. A. C.,
*Appellant.*

Washington County Circuit Court No. J120454;
Petition No. 01J120453M;
A155310

328 P3d 769

Christa Obold-Eshleman argued the cause and filed the brief for appellant.

Erin K. Galli, Senior Assistant Attorney General, argued the cause for respondent. On the brief were Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Inge D. Wells, Senior Assistant Attorney General.

Before Armstrong, Presiding Judge, and Nakamoto, Judge, and Egan, Judge.

NAKAMOTO, J.

**NAKAMOTO, J.**

In this consolidated juvenile dependency appeal, father challenges (1) a March 2013 judgment asserting jurisdiction over his two children, and (2) an order of the juvenile court denying his motion to set aside an earlier, October 2012, judgment in which the court had asserted jurisdiction over father's children based on mother's admissions to allegations in the petitions. As explained below, we conclude that the juvenile court abused its discretion in denying father's motion to set aside the October 2012 judgment; further, we agree with father that the evidence was legally insufficient to support jurisdiction over his children. Accordingly, we reverse and remand.

## I. FACTS AND PROCEDURAL HISTORY

We briefly describe the family and the undisputed facts leading to the family's involvement with the Department of Human Services (DHS) and then describe the procedural history of the dependency cases below, as well as father's two appeals. Later, as we consider each of father's assignments of error, we discuss other relevant facts in light of applicable standards of review.

We take the following facts from the record. Mother and father, who began their relationship in 2003 when they were living in Texas, have two children, H and M. Mother gave birth to H in 2004, and mother and father married later that year. M was born in 2008. The family continued to live in Texas until 2010, at which point father moved to Oregon in search of employment. Mother remained in Texas with the children until 2011, when she and the children joined father in Oregon. DHS first became involved with the family in August 2012 after receiving information that a domestic violence incident between the parents had occurred while M was home; H was not home at the time of the incident. Father was later arrested and charged in connection with the incident.

DHS filed petitions in September 2012 alleging that the children were within the jurisdiction of the juvenile court under ORS 419B.100(1)(c). In the amended petitions,

DHS alleged that the children were within the court's jurisdiction on the following grounds:

"A.   The mother was subjected to domestic violence by the father and the mother is unable to protect the child from exposure to father's domestic violence without DHS intervention.

"B.   The mother is aware of the allegation against the father, that they [*sic*] cannot safely parent the child, but has done nothing to assert custody of her child.

"C.   The father * * * has a pattern of domestic violence against his current partner, which he has committed in front of said child and if left untreated, interferes with his ability to safely parent said child.

"D.   The child's sibling has been exposed to domestic violence by the father.

"E.   The father has engaged in a pattern of domestic violence with others with whom he has had a relationship, he has not successfully engaged in treatment of this conduct, and he is currently in a relationship with the child's mother.

"F.   [The father] is said child['s] legal father as he is listed on said child's birth certificate."

The juvenile court held a shelter hearing, after which it granted DHS temporary custody of the children. The shelter order directed the parties to appear at a status conference in October 2012; the court scheduled the contested jurisdictional hearing for November 2012. In the meantime, DHS placed the children with mother.

Both mother and father appeared with counsel at the October 2012 status conference. DHS informed the court that mother was prepared to resolve her allegations through admissions. As to father, DHS alerted the court that father's criminal case was pending and that his trial was scheduled for early November 2012. Accordingly, DHS represented that it and father had agreed to request that the court convert the November 2012 contested jurisdictional hearing to a second status conference, explaining that "depending on how the criminal case—if it goes to trial, and depending on the resolution of that, that would impact how the juvenile

case would resolve." After confirming that all of the parties agreed to convert father's contested jurisdictional hearing date to a second status conference, the court granted the parties' request.

The focus of the status conference then turned to mother's admissions. DHS told the court that mother was admitting allegations A and B, as well as a new allegation, G, which stated that "Mother has mental health issues [which,] if left untreated[,] [a]ffects her ability to parent child." After accepting mother's admissions, the court asked DHS about disposition and then found the children within the jurisdiction of the court. In the judgment, the court placed the children in the legal custody of DHS and in the physical custody of mother and ordered mother to comply with the conditions set forth in her action agreement. The October 2012 judgment did not address the allegations against father. The judgment directed that there would be a review hearing held under ORS 419B.449 on February 25, 2013; a permanency hearing under ORS 419B.476 was scheduled for September 2013. At DHS's encouragement, mother moved with the children back to Texas in mid-November 2012.

Father's contested jurisdictional hearing was not held until March 2013. Between the October 2012 status conference and the March 2013 contested hearing, father was acquitted of the criminal charges associated with the August 2012 incident. At the time of the contested hearing, mother was still living in Texas, but Texas Child Protective Services (Texas CPS) had removed the children from her care and placed the children with their maternal grandmother, who also lived in Texas. Both mother and the maternal grandmother testified telephonically at the hearing. In its opening statement, DHS expressed that "[t]his case is about domestic violence, and the issue is whether or not the domestic violence presents a current threat of harm to these children." After the first day of the hearing, however, DHS filed amended petitions adding allegation H, which alleged that "Father is aware of mother's mental health issues which if left untreated [a]ffects her ability to parent her children and has failed to protect said child and said child's sibling from mother." At the close of the evidence, DHS moved to

dismiss allegation E, which alleged that father engaged in a pattern of domestic violence with others with whom he has had a relationship. Accordingly, DHS's closing argument focused on allegations C, D, and H relating to domestic violence and father's protection of the children.[1]

At the end of the hearing, the juvenile court indicated that it was asserting jurisdiction over the children again, stating that "we'll establish the jurisdiction over the children as to father on F and H only." The court concluded that DHS had failed to prove allegations C, D, and E, which had alleged that father had a pattern of domestic violence against mother and other partners, and that the children were exposed to domestic violence by father. Before adjourning to allow the parties to discuss a recommended disposition, the court stated:

> "Just for purposes of your conversations, so that you have some idea of where I am coming from, it's appalling to me that [father] has allowed his children to be affected, to the degree that they have, by their mother. But that's it."

After the recess, the court held a dispositional hearing. The court then ordered that the children remain in substitute care in Texas and ordered father to participate in parenting classes, "with a focus on mental health issues and domestic violence issues." The court stated, "I understand that the findings from the Court were that domestic violence allegations weren't proven. Although there certainly is some concern there, legitimately."

The March 2013 jurisdictional judgment reflected the court's ruling. In the form judgment under a section labeled "Petition Allegations Contested and Proved" the court wrote "F, H." In the section labeled "Petition Allegations Contested and Not Proved," the court wrote "C, D, E." In a section labeled "Petition Allegations Admitted," the court repeated mother's October 2012 admissions to allegations A, B, and G—though the court did not discuss those admissions at the hearing. In April, father filed a timely appeal challenging the 2013 jurisdictional judgment.

---

[1] The parties did not discuss allegation F because it alleged father's status as a legal parent. It does not appear from the record that the court ruled on DHS's motion to dismiss allegation E.

In August 2013, while father's appeal of the 2013 jurisdictional judgment was pending, father filed a motion with the juvenile court requesting that the court set aside the 2012 jurisdictional judgment. The court considered father's motion at an emergency hearing. At the time of that hearing, father's children were still living in Texas with their maternal grandmother. At the hearing, in addition to arguing father's motion to set aside, father's counsel sought to have the children returned to his custody.

Also at the hearing, father sought to clarify what services he was required to engage in under the 2013 jurisdictional judgment, given that the judgment reflected that DHS had failed to prove that he had engaged in domestic violence. As noted, despite the failure of proof on allegations C and D in the 2013 judgment, the court had ordered father to participate in parenting classes with a focus on domestic-violence issues. Pursuant to that order, father had been participating in an "Allies in Change" class, which is a 52-week class geared toward perpetrators of domestic violence.

At the end of the hearing, the court denied father's motion to set aside the 2012 judgment, but it ordered that the children be returned to father by the end of the month. The court also ordered that father's attendance for the remainder of the "Allies in Change" class be discontinued because those "services are inappropriate given the jurisdiction," explaining that the court's order "in regards to his action agreement was confusing."

Father then timely appealed the court's denial of his motion to set aside the 2012 judgment. We issued an order consolidating father's appeals. In October 2013, while father's appeals were pending, the juvenile court terminated the wardships and dismissed the cases.[2]

---

[2] DHS filed a notice with this court arguing that the termination of the wardships and dismissal of the cases rendered father's appeals moot because father had failed to identify any collateral consequences of the jurisdictional judgments. Citing *State v. S. T. S.*, 236 Or App 646, 238 P3d 53 (2010), father responded that the jurisdictional judgments contained findings that father had engaged in domestic violence, which would have a negative affect on father's DHS record, as well as the negative social stigma of having a finding on the record that father had perpetrated domestic violence. DHS then filed a second notice with this court, arguing that father's appeal of the motion to set aside is moot only if we affirm the 2013 judgment, apparently arguing that, because the 2013 judgment contained

## II. ANALYSIS

A. *Father's appeal of the order denying his motion to set aside the 2012 jurisdictional judgment*

We first address father's appeal of the juvenile court's denial of his motion to set aside the 2012 jurisdictional judgment because it provides helpful context for our consideration of father's challenge to the 2013 judgment. Father asserts that the juvenile court abused its discretion when it denied his motion to set aside the 2012 jurisdictional judgment, arguing that the court lacked authority to assert jurisdiction over his children before he had had a hearing to challenge the allegations in the petitions.

We review a juvenile court's denial of a motion to set aside a judgment for abuse of discretion. *Dept. of Human Services v. A. D. G.*, 260 Or App 525, 534, 317 P3d 950 (2014). "If the court's decision was within the range of legally correct discretionary choices and produced a permissible, legally correct outcome, then the court did not abuse its discretion." *State ex rel Juv. Dept. v. D. J.*, 215 Or App 146, 155, 168 P3d 798 (2007). We review the underlying legal questions for legal error. *A. D. G.*, 260 Or App at 534.

A juvenile court's authority to set aside a judgment is set forth in ORS 419B.923. Under that statute, a juvenile court "may modify or set aside any order or judgment made by it." ORS 419B.923(1). "Reasons for modifying or setting aside an order or judgment include, but are not limited to" clerical mistakes, excusable neglect, and newly discovered evidence. ORS 419B.923(1)(a) - (c). In *A. D. G.*, we concluded that the authority of a juvenile court to set aside a judgment under ORS 419B.923 is broad and is not limited to the circumstances enumerated in the statute. 260 Or App at 536, 539. We also considered in that case whether the juvenile court's denial of the mother's motion to set aside was an abuse of discretion. In *A. D. G.*, the parties disputed "whether ORS

_____

the same implied findings as the 2012 judgment, any error in the 2012 judgment is harmless if the March judgment is affirmed. We conclude that father's appeal is not moot because the collateral consequences associated with findings of domestic violence in a jurisdictional judgment are sufficient to render this a live controversy. *S. T. S.*, 236 Or App at 653-54. Furthermore, because we reverse the 2013 judgment, DHS's harmless error argument is inapplicable.

419B.819(7), which governs the effect of a parent's failure to appear for any hearing relating to a [termination of parental rights (TPR)] petition, permitted the juvenile court to enter a default TPR judgment against mother." 260 Or App at 540. We concluded that ORS 419B.819(7) did not authorize the court to enter a default judgment against the mother in that case and that, because "[t]hat same legal error was the basis for the juvenile court's decision to deny mother's motion to set aside the default judgment * * * the court's ruling was not within a range of legally correct choices and constitute[d] an abuse of discretion." *Id.* at 547. Thus, under *A. D. G.*, if the juvenile court in this case was not authorized to enter the 2012 judgment, and if the court relied on that legal error in denying father's motion to set aside, the court's ruling is not within the range of legally correct choices and its denial of father's motion would constitute an abuse of discretion.

We turn now to the arguments father made to the juvenile court in conjunction with his motion to set aside. Father argued that the 2012 judgment of jurisdiction and wardship was improvidently entered. According to father, mother's unilateral admission to alleged wrongdoing by both father and mother—including that "mother was subjected to domestic violence by the father"—should neither conclusively establish facts nor determine the sufficiency of the allegations to establish subject matter jurisdiction of the juvenile court under ORS 419B.100, before father was given an opportunity to contest the petitions. Father asked the juvenile court to rule that his children should not have been adjudged to be within the jurisdiction of the court, made wards of the court, and committed to the custody of DHS before the contested jurisdictional trial, and, therefore, to set aside the 2012 judgment. He argued that the juvenile court's assertion of jurisdiction based on mother's admissions was inconsistent with the procedural rights afforded parents in the juvenile code, as well as the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

At the August 2013 emergency hearing, when the court considered his motion to set aside, father argued that a court cannot assert jurisdiction over children until both parents' contentions concerning the jurisdictional petition have been resolved. Instead, father argued, after mother made

her admissions, the court should have continued temporary jurisdiction over the children and made any determination of "full jurisdiction" only after father's contested jurisdictional hearing. That way, father explained, the court could address mother's admissions that "actually don't end up ultimately correlating with what was found in the hearing[.]"

DHS agreed that "there was no jurisdiction on the father at the hearing at the end of October" but expressed concern about "calling it partial jurisdiction or something like that[.]" The court asked DHS about father's motion, and the following colloquy occurred:

"THE COURT: So [counsel for DHS], what is your position on [father's] request to set aside the October 31st, 2012 order? I frankly don't see the issue with that order.

"[DHS COUNSEL]: I think we're—I think I agree—I do agree with [father] that it has nothing to do with jurisdiction regarding father. I don't want to set aside [mother's] jurisdiction.

"THE COURT: As do I, but it seems to me like it only applies to the mother.

"[DHS COUNSEL]: I completely agree with that.

"THE COURT: Okay.

"[FATHER'S COUNSEL]: And Your Honor, there is no jurisdiction without both parents. So we're saying that there can't be jurisdiction taken at the time of mother but still continued temporary jurisdiction. While her admissions are accepted by the [c]ourt, jurisdiction comes when both parents have finally resolved their cases.

"THE COURT: All right. Very good. Well, I'm going to deny the motion to set aside that particular order, and I'm sure you will pursue that by a different avenue."

On appeal, father again argues that the juvenile court erred when it made findings of fact, adjudged father's children to be within the jurisdiction of the court, made them wards of the court, and committed them to the legal custody of DHS, all before father's contested jurisdictional hearing. He contends that the juvenile code contemplates a single judgment of jurisdiction, based on the totality of the conditions and circumstances of *the child*, not on a division

of proof as to each parent. Father further argues that the assertion of jurisdiction without a hearing interfered with his fundamental right to parent his children and implicates the Due Process Clause of the Fourteenth Amendment. Father also raises the same constitutional concerns with the court's assertion of jurisdiction based on mother's unilateral admission to allegations that he contested. Under father's view, mother's admissions were simply evidence that should have been considered at father's contested hearing to determine whether, under the totality of the circumstances, there was a basis for the court to assert jurisdiction over the children.

For its part, DHS concedes that the entry of the 2012 judgment was erroneous and agrees with father that the juvenile code does not contemplate a separate jurisdictional judgment for each parent. Like father, DHS argues that "[i]n all juvenile dependency cases arising under ORS 419B.100(1)(c), the inquiry is whether the *children's* condition or circumstances endanger their welfare," citing *Dept. of Human Services v. S. P.*, 249 Or App 76, 84, 275 P3d 979 (2012), and states that "if a child has a parent capable of caring for him safely, juvenile court jurisdiction is not warranted." DHS limits its concession to the circumstances in this case, in which both parents were served with summons and were present at a hearing, and one parent sought to contest the jurisdictional allegations. For the reasons stated below, we agree with father and accept DHS's concession.

The juvenile code provides that, under ORS 419B.100(1)(c), a juvenile court has exclusive original jurisdiction in any case involving a person who is under 18 years of age and "[w]hose condition or circumstances are such as to endanger the welfare of the person[.]" As we have explained, the statutes in the juvenile code "contemplate that ORS 419B.100(1)(c) brings *the child* whose condition or circumstances are as described in the statute within the jurisdiction of the court[.]" *S. P.*, 249 Or App at 84 (emphasis in original). We have also recognized that "jurisdiction 'over a child' under ORS 419B.100(1)(c) is often the result of the conduct, condition, or circumstances of one or both parents; thus, the courts sometimes refer to jurisdiction 'as to' or 'with respect to' a particular parent." *Id.* at 85 n 10.

However, the "juvenile court's focus at the hearing on jurisdiction is on *the child's* conditions or circumstances at the time of the hearing and whether the totality of those circumstances demonstrates a reasonable likelihood of harm to the welfare of the child." *Dept. of Human Services v. C. F.*, 258 Or App 50, 54, 308 P3d 344, *rev den*, 354 Or 386 (2013) (emphasis in original). Accordingly, ORS 419B.100(1)(c) requires the juvenile court to consider *all of the facts presented in the case* before it. *State ex rel Juv. Dept. v. Smith*, 316 Or 646, 652-53, 853 P2d 282 (1993).[3] After looking at all the facts, if the court finds that there is a reasonable likelihood of harm to the welfare of the child, the court may take jurisdiction. *Id.* at 653.

The juvenile code recognizes that a parent has a right to deny the allegations in the petition, and the code requires that, when allegations are contested, the court set the case for a hearing within 60 days of the petition being filed. ORS 419B.305(3), (1).[4] At that hearing, "[t]he facts alleged in the petition showing the child to be within the jurisdiction of the court as provided in ORS 419B.100(1), unless admitted, must be established by a preponderance of competent evidence." ORS 419B.310(3).

A juvenile court's determination that a child is within the jurisdiction of the court affects the rights of the parents. When a juvenile court asserts jurisdiction over a child, that child is made a ward of the court. ORS 419B.328(1). Once a child is made a ward of the court, it is the court that decides who will have legal custody of the child based on its determination of what is in the best interest and welfare of the child. "[T]he juvenile court may direct that the ward remain in the legal custody of the ward's parents, or it may direct that the ward be placed in the legal custody of a relative, a foster home, or DHS." *Dept. of Human Services v. S. M.*, 355 Or 241, 246, 323 P3d 947 (2014) (citing ORS 419B.331; ORS 419B.337). In turn, whomever the court

---

[3] In *Smith*, the Oregon Supreme Court interpreted *former* ORS 419.476(1)(c) (1991), *repealed by* Or Laws 1993, ch 33, § 373, which was the predecessor to ORS 419B.100(1)(c).

[4] Under ORS 419B.305, a court may continue a petition beyond the 60-day period upon written order supported by findings of good cause.

awards legal custody of the child also has "physical custody and control of the ward." ORS 419B.373(1). Attendant to that custody and control is the authority to authorize ordinary medical treatment, and in emergencies, the authority to authorize surgery and other extraordinary medical care. ORS 419B.373(4). Those are just some of the many consequences inherent in a court's assertion of jurisdiction over a child that demonstrates that a finding of jurisdiction interferes with a parent's right to direct the custody and control of the child. The juvenile code and our case law require that, before the juvenile court can so interfere, it must determine that jurisdiction is warranted. That determination requires the court to consider all of the facts in the case before it and to consider whether, under the totality of the circumstances, the child's welfare is endangered.

Accordingly, we hold that a juvenile court cannot assert jurisdiction over a child based on the admissions of one parent when the other parent has been served and summoned, appears, and contests the allegations in the petition. In such a case, the juvenile court can only assume jurisdiction over the child after a contested hearing on the allegations denied by the other parent. If it were otherwise, a juvenile court could assert jurisdiction over a child and make the child a ward of the court, depriving one parent of legal and physical custody of the child, without a determination that that parent cannot safely parent the child.

Here, that is precisely what happened. Mother admitted allegations in the complaint that were phrased in terms of her conduct. Father did not admit to any of the allegations, and the court set a contested hearing to consider those allegations for a future date. However, the juvenile court asserted jurisdiction and made the children wards of the court before adjudicating the allegations against father. We agree with DHS that, if a child has a parent who appears in the proceeding and is capable of caring for the child safely, juvenile court jurisdiction is not warranted and that, unless and until DHS proved that neither parent who appeared could safely parent the child, the court could not enter a jurisdictional judgment. The proper procedure in those cases is for the court to receive the one parent's admissions and delay making a jurisdictional determination until

after the contested hearing. Accordingly, the juvenile court erred when it asserted jurisdiction over the children prior to father's contested hearing.

The court relied on that legal error in denying father's motion to set aside the 2012 jurisdictional judgment. In considering the motion, the court expressed its belief that the 2012 judgment applied only to mother and that it had nothing to do with jurisdiction regarding father. As explained above, however, the 2012 judgment brought the *children* within the court's jurisdiction, which is appropriate only after a determination that, under the totality of the children's circumstances, their welfare is endangered. Because the 2012 judgment was entered before father had a chance to contest the allegations of the petitions, the judgment was not based on the totality of the children's circumstances. Because the juvenile court lacked authority to assert jurisdiction over the children before father's contested hearing, and because it relied on that error in denying father's motion, we conclude that the juvenile court abused its discretion when it denied father's motion to set aside the 2012 judgment. Accordingly, we reverse the trial court's order denying father's motion to set aside and remand with instructions for the court to enter an order setting aside the 2012 judgment.

B. *Father's appeal of the 2013 jurisdictional judgment*

We turn to father's appeal of the 2013 judgment, in which the court asserted jurisdiction over his children based on the allegations against him. Father's challenge to the 2013 jurisdictional judgment is two-fold. First, father challenges the sufficiency of the evidence to prove allegations A and H in the petitions. Second, father argues that the juvenile court erred in asserting jurisdiction over his children because the totality of the circumstances in this case do not demonstrate a current threat of serious loss or injury to the children that is likely to be realized.[5] For the reasons that follow, we agree with father that jurisdiction was not warranted in this case.

_____

[5] In his appeal of the 2013 judgment, father also argues that the court erred in unconditionally admitting father's psychological evaluation that contained hearsay. We reject that assignment without discussion.

The parties have not requested *de novo* review, and we decline to conduct such a review in this case. *See* ORS 19.415(3)(b) (in nontermination cases, we have discretion to exercise *de novo* review). Accordingly, "we view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome." *Dept. of Human Services v. N. P.*, 257 Or App 633, 639, 307 P3d 444 (2013).

Father challenges the sufficiency of the evidence to prove allegations A and H in the petitions. When a party challenges the sufficiency of the evidence to prove an allegation, we review the juvenile court's explicit and implied findings to determine if there is any evidence in the record to support those findings. *N. P.*, 257 Or App at 639-40. Here, the juvenile court did not make any express findings. Therefore, our task is to determine whether the juvenile court's implied findings regarding allegation A and H are supported by any evidence in the record.

We begin with allegation A, which alleged that "mother was subjected to domestic violence by the father and the mother is unable to protect the child from exposure to father's domestic violence without DHS intervention." As mentioned above, in addition to allegation A, DHS alleged in allegations C and D of the petitions that father had engaged in domestic violence toward mother and that the children had been exposed to father's domestic violence. At the March 2013 hearings, DHS presented evidence that mother and father had a history of arguing and that three of their arguments involved some physical component. The first of those arguments was an incident in Texas in 2006, in which mother and father were fighting over car keys. Both mother and father had one end of the keys and both were trying to get them from the other's hand. Mother sustained an injury to her wrist during that incident. The second incident occurred in 2009, when mother got upset that H was watching a television program and wanted to discipline H. Father intervened by pulling mother away from H and forcing her into another room of the house.

Finally, the third argument between mother and father was the 2012 incident that precipitated DHS's involvement in this case, which occurred at their home one evening. Earlier that day, father had called mother to ask if father's friend, Green, could come to the house. Mother had told father that that was fine as long as Green was gone by the time she got home. Father apparently misunderstood mother, and when mother arrived home, Green was still there. Mother became upset and father left the house with Green. Minutes later, father returned and confronted mother in the kitchen about embarrassing him in front of Green. Mother testified that she backed away from father down the hallway and towards the living room. She further testified that "I got pushed on the ground. Got back up. Was walking to go upstairs to get away when I got pushed again into the wall." Father's account differed. Father testified that, after confronting mother, he was trying to leave the house. Mother was in front of him and was walking backwards as he was trying to walk down the hallway. Father testified that mother tripped over the carpet and had fallen backwards against the wall, hitting her head. Father tried to help mother up, but she refused his help and then a few minutes later, mother left the house with M and called the police.

Father makes two primary arguments in his challenge to the sufficiency of the evidence to prove allegation A. First, father argues that the juvenile court committed legal error when it treated mother's admission of allegation A as conclusively establishing that allegation despite the fact that father contested that allegation. Father argues that mother's admission did not preclude him from challenging the truth or sufficiency of *all* the allegations in the petitions that allegedly established jurisdiction over his children, and that he succeeded in challenging allegation A when the court concluded that DHS had failed to prove the other domestic violence allegations. Second, father argues that the evidence was insufficient to prove allegation A given the fact that the court dismissed the other domestic violence allegations and that, in doing so, the court impliedly found mother's account of the alleged domestic violence not to be credible.

DHS responds that, when viewed in the light most favorable to the juvenile court's disposition, the evidence was sufficient to support a finding that mother was subjected to domestic violence by father. Additionally, at oral argument, DHS argued that the juvenile court's findings regarding domestic violence in the family were not inconsistent because it was possible for the court to find that father had subjected mother to domestic violence, while also finding that father had not engaged in a *pattern* of domestic violence.

Initally, we note that we disagree with DHS that the court did not make inconsistent findings regarding domestic violence. At the end of the March 2013 hearing, the court dismissed allegations C, D, and E as not proved and explained that "we'll establish the jurisdiction over the children as to father on F and H only." Nonetheless, the juvenile court included mother's admission to allegation A in the 2013 judgment. The inclusion of that admission indicates that the juvenile court found that mother was subjected to domestic violence by father and that she was unable to protect the children from exposure to father's domestic violence, while, at the same time, the court's dismissal of allegations C, D, and E indicates that the court found that father had not engaged in a pattern of domestic violence against mother or anyone else, as well as that the children had not been exposed to father's domestic violence. Furthermore, the court's statements at the hearing indicate that what the court thought was problematic for the children was the fact that father had exposed them to mother's mental health problems—not that father was a domestic abuser. That intent was confirmed by the court at the August 2013 hearing, at which it clarified that domestic violence classes were not appropriate given the bases for jurisdiction, further indicating that the court did not assert jurisdiction based on father's alleged domestic violence. Therefore, though allegation A is included in the 2013 judgment, it is inconsistent with the court's statements and other findings.

With regard to father's legal argument, we agree that it was legal error for the court to give conclusive effect to mother's admission that mother was subjected to domestic violence by father when father denied that he had abused

mother. Allegation A did not concern only the conduct of mother, but also included the disputed conduct by father. Mother's admission that she was subjected to domestic violence by father cannot conclusively establish that fact when father denied that allegation. In some dependency cases, as in this one, the parents are adverse to one another. Father had a right to deny the allegations in the petitions, and the juvenile court could not rely on one parent's admission to conclusively establish an allegation regarding the contesting adverse parent's conduct. In such a case, the juvenile court can consider the admission by one parent as a fact in determining whether DHS proved the admitted allegation, but it cannot conclusively establish that allegation. Here, then, to the extent that the court relied solely on mother's admission for establishing allegation A, it was error to do so.

In short, we agree with father that the evidence was insufficient to prove allegation A. First, the juvenile court implicitly found that mother's testimony regarding domestic violence between the couple was not credible because the court dismissed the domestic violence allegations against father. Second, as mentioned above, the court's inclusion of allegation A in the 2013 judgment was inconsistent with the court's other implied factual findings that father had not engaged in a pattern of domestic violence, as well as its implied finding that the children were not exposed to father's domestic violence. In fact, at the August 2013 hearing, the juvenile court confirmed that domestic violence was not the basis for jurisdiction, further indicating that there was insufficient evidence to support allegation A.

Father also challenges the sufficiency of the evidence to prove allegation H, which alleged that father was aware of mother's mental health issues, which, if left untreated, affected her ability to parent the children, and that he failed to protect the children from mother. Father acknowledges that there was sufficient evidence to prove that mother had mental health issues and that father was aware of those issues, but he argues that the evidence was insufficient to prove that he had failed to protect the children from mother. According to father, the evidence at the hearing demonstrated that father had a history of actively intervening and

protecting the children from mother and that father employed strategies of mitigating the effects of mother's mental health issues on the children, while preserving the family unit. Citing *Dept. of Human Services v. D. S. F.*, 246 Or App 302, 266 P3d 116 (2011), father argues that such intervention did not require him to actually remove the children from contact with mother.

Again, our task in determining whether the evidence was sufficient to support the juvenile court's findings is to review for any evidence. As to allegation H, DHS presented evidence that mother suffers from mental health issues and that those issues affect her ability to parent the children. Father admitted that mother had mental health issues, and he testified that her issues manifested with bipolar-like symptoms or mood swings. Father testified that mother can "go from * * * calm and reasonable to * * * screaming, yelling and unable to be reasoned with, *et cetera*. And then within five minutes, she can flip right back." Father testified that mother has a history of mental health issues and that she has suffered from depression throughout their marriage. Father also testified that, in the summer of 2012, mother sought counseling and was diagnosed with manic depression, severe anxiety, and PTSD from a car accident in 2006. The children's maternal grandmother also testified that mother has ADHD.

DHS also presented evidence that mother had a "difficult" relationship with H because mother had not bonded with H. As a result, evidence demonstrated that mother treats H differently than she treats M, with whom she has bonded. Father testified that when H was younger, mother would spank her a lot; he testified that he had discussed mother's use of spanking with her and that they had agreed that mother would stop disciplining H through spankings. After that discussion, father testified that mother spanked H "only a few times." DHS also presented evidence of a 2009 incident in which mother slapped H across the face. At the time of that incident, father had not been permitted to live at the family home due to a mandatory restraining order that had resulted from the previously mentioned 2009 argument between mother and father in which father had pulled

mother away from H to prevent her from disciplining H. After mother had slapped H, father told mother to report herself to Texas CPS or he would. Mother reported the incident, and she received parenting classes as a result.

Father testified that there had been an improvement in mother's relationship with H in the last year and a half to two years. Before that time, father explained that mother would yell at H almost every other day and mother would send H to her room so that mother would not have to be around her. Father further testified that he would talk to H to explain to her what was happening and to "try to alleviate some of the stress there." In early 2012, H received counseling for two or three months after she had started acting out at home. Father testified that it was possible H's behavior was related to mother's mental health issues. Father also testified that he encouraged mother to seek counseling to start working on her relationship with H, which mother did in the summer of 2012.

Despite mother's strained relationship with H, the evidence demonstrated that H was happy, felt safe at home and at school, and that she had positive things to say about her parents and her brother. Francom, the DHS caseworker who was first assigned to the case, testified that H reported that her parents "tend to yell and argue but she's not sure what they argue about." H also reported that sometimes mother will spank her, but that father never did, and that she had never seen her parents physically fighting. Francom testified that H seemed like a "pretty well-adjusted" and "advanced" child.

As mentioned above, DHS presented evidence that mother and father argue in front of the children and that sometimes those arguments have physical components. DHS presented evidence that M was present during the August 2012 incident and had gotten upset and kicked father after M saw that mother was injured from falling. DHS also put on evidence that when police responded to mother's 9-1-1 call, M was upset and "whimpering." After that, M experienced nightmares and had some trouble sleeping.

Evidence at trial also demonstrated that the children were living with their maternal grandmother in Texas after Texas CPS had removed them from mother's custody. Mother was still living in Texas, with no immediate plans to return to Oregon and testified that she intended to file for divorce, though she stated that she was not one-hundred percent positive that she would do so. She also indicated that she was not sure whether she would resume her relationship with father. Father was living in Oregon at the time of the hearing and, due to his job, did not intend to move to Texas, but was considering visiting the children there after the hearing. Father also expressed a desire to continue his relationship with mother if mother continues to address her mental health issues in counseling and continues to rebuild her relationship with H.

After reviewing the record, we have difficulty finding evidence to support the allegation that father failed to protect the children from mother. But, even assuming the existence of such evidence, we agree with father that DHS failed to prove that jurisdiction was warranted in this case because the circumstances do not demonstrate a current threat of serious loss or injury to the children that is likely to be realized.

As mentioned above, our task is to determine whether, when viewed in the light most favorable to the juvenile court's disposition, the evidence was legally sufficient to warrant jurisdiction. Here, assuming allegation H was proved, the only other allegations that were proved or admitted were allegations B (mother has not asserted custody), G (mother has mental health issues), and F (father is the legal father of the children). Combined, those circumstances under the facts of this case are legally insufficient to prove that there was a current risk of nonspeculative harm to the children that would warrant jurisdiction.

Under ORS 419B.100(1)(c), juvenile dependency jurisdiction is warranted when a child's "condition or circumstances are such as to endanger the welfare" of the child. A child is "endangered" if the child is exposed to conditions or circumstances that "present a current threat of serious loss

or injury." *Dept. of Human Services v. C. J. T.*, 258 Or App 57, 61, 308 P3d 307 (2013). In determining whether jurisdiction is proper, the key inquiry is "whether, under the totality of circumstances, there is a reasonable likelihood of harm to the welfare of the child." *Dept. of Human Services v. C. Z.*, 236 Or App 436, 440, 236 P3d 791 (2010) (internal quotation marks omitted). DHS has the burden to prove that there is "a nexus between the allegedly risk-causing conduct and the harm to the child," and that the risk of harm is nonspeculative and present "at the time of the hearing." *C. J. T.*, 258 Or at 62.

At the time of the March 2013 hearing, the children were not living with mother; Texas CPS had removed them from mother's custody and placed them with their maternal grandmother. Mother and father were not living together, and indeed, were living in separate states. Thus, at the time of the hearing, the children were not at risk of being exposed to mother's mental health issues, and, because they were not with mother, father cannot be said to have been failing to protect them from mother's mental health issues.

Even if the family were to be reunited eventually, the evidence presented on the degree of mother's mental health issues and their effects on the children do not demonstrate a current risk of serious harm. That is particularly so given father's history of actively protecting his children from mother's mental health issues. Father recognizes that mother and H have a difficult relationship and has ameliorated the effects of that bad relationship by encouraging mother to seek counseling, providing counseling for H, discussing mother's behavior with H, and providing opportunities for H to spend extended time with relatives. Furthermore, despite the difficult relationship between mother and H, H is a well-adjusted child, and there is no evidence that H has suffered, or will likely suffer, serious emotional harm due to mother's mental illness.

As for physical harm to H, the only instance in which mother physically injured H was in 2009 and occurred when father was not allowed to live at the house due to a restraining order. Father, in those circumstances, cannot be said

to have failed to protect H from mother. Furthermore, that incident occurred more than three years before the hearing, and DHS presented no other evidence of mother physically harming H since that time, beyond spankings. We agree with father that H has not received ideal parenting, but, under the totality of the circumstances, the evidence does not establish a risk of serious threat of injury or loss that is likely to be realized.

As for risk of harm to M, DHS failed to present any evidence that M had suffered or will likely suffer serious emotional or physical harm as a result of mother's mental illness or father's failure to protect M. The evidence demonstrated that mother had a positive relationship with M and that she never used physical violence against him. The only evidence of mental harm was M's reaction to the 2012 argument between his parents. After seeing that mother was injured, M kicked father and told him to leave mother alone. After that, M experienced some nightmares and sleeplessness. That evidence fails to demonstrate that there is a current threat of serious emotional harm to the child.

DHS also argues that M was endangered by virtue of exposure to mother's mood swings and seeing mother treat H poorly. We recognize that a condition or circumstance need not involve a child directly for a court to find that the child is endangered if the condition or circumstance creates a harmful environment for the child. *C. Z.*, 236 Or App at 443. However, the state must prove that the harm is, in fact, present. *Id.* Here, DHS failed to demonstrate how mother's mental health issues created an environment in which M was likely to suffer serious emotional or physical harm at the time of the hearing, particularly when neither H nor M was living with mother and father was seeking custody of the children.

In sum, we conclude that the juvenile court erred in asserting jurisdiction over father's children because the evidence was legally insufficient to demonstrate that, under the totality of the circumstances, there was a current risk of serious emotional or physical harm to the children, likely to be realized.

Judgment in A154075 reversed and remanded; order in A155310 reversed and remanded with instructions to enter an order setting aside the October 2012 judgment.