Argued and submitted February 3, reversed March 14, 2012

In the Matter of
I. T. and A. C., Children.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

D. M.,
*Appellant.*

Multnomah County Circuit Court
2010802921, 2010802922;
Petition Number 107081M;
A149499

275 P3d 971

Shannon L. Flowers, Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Appellate Division, Office of Public Defense Services.

Inge D. Wells, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Anna M. Joyce, Solicitor General.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Nakamoto, Judge.

SCHUMAN, P. J.

## SCHUMAN, P. J.

Mother appeals the juvenile court's decision to continue to exercise jurisdiction over her two children, I and A. When jurisdiction was first established, mother stipulated to the allegation that she had, at times, failed to provide adequate supervision of the children. At a subsequent review hearing, the court concluded, over mother's assertion to the contrary, that the condition underlying the stipulated allegation persisted. We reverse.

The parties agree on most of the legal principles involved in this case. The juvenile court has jurisdiction over a case "involving a person who is under 18 years of age and * * * [w]hose condition or circumstances are such as to endanger the welfare of the person or of others[.]" ORS 419B.100(1)(c). A child found to be within the jurisdiction of the court becomes a ward of the court until, as relevant to this case, the court enters an order terminating the wardship. ORS 419B.328(2)(c). Such an order may result from a review hearing, ORS 419B.449(1), where the juvenile court is called on "to determine if the court should continue jurisdiction and wardship or order modifications in the care, placement and supervision of the child or ward." The review hearing "place[s] in issue whether the conditions and circumstances of [the children] require[ ] them to remain in the court's jurisdiction." *State ex rel Juv. Dept. v. Gates*, 96 Or App 365, 372, 774 P2d 484, *rev den*, 308 Or 315 (1989). "A wardship cannot continue if the jurisdictional facts on which it is based have ceased to exist. However, that determination does not include a retrial of the original allegations. The evidence is limited to whether the conditions that were originally found to endanger a child persist." *Id.* (citation omitted). In reviewing the juvenile court's decision whether to dismiss wardship, we are bound by the court's explicit and implicit findings of historical fact unless there is no evidence in the record to support them, *Dept. of Human Services v. C. Z.*, 236 Or App 436, 442, 236 P3d 791 (2010), but we review the court's ultimate legal conclusion regarding whether to dismiss or not for legal error.

The parties appear to disagree on one point. Mother argues that wardship must be dismissed unless DHS proves

that the alleged jurisdictional bases continue to pose a current threat of serious loss or injury, citing *Dept. of Human Services v. A. F.*, 243 Or App 379, 386, 259 P3d 957 (2011). According to DHS, the correct standard was set by the Supreme Court in *State ex rel Juv. Dept. v. Smith*, 316 Or 646, 653, 853 P2d 282 (1993): the court must continue wardship if "there is a reasonable likelihood of harm to the welfare of the child." DHS maintains that, in *A. F.*, we "[did] not cite" *Smith* and that we are "bound by" it. DHS is correct that we did not cite *Smith* in *A. F.*; however, in the same paragraph where we explained that the court can maintain wardship only if there is a current threat of serious loss or injury, we also quoted the precise *language* from *Smith*.

> "Under ORS 419B.100(1)(c), the juvenile court has 'exclusive original jurisdiction' over any case involving a child 'whose condition or circumstances are such as to endanger the welfare' of the child. 'Endanger connotes exposure to "danger," which generally involves "the state of being threatened with serious loss or injury[.]" ' *State ex rel Dept. of Human Services v. Shugars*, 202 Or App 302, 321, 121 P3d 702 (2005) (quoting *Webster's Third New Int'l Dictionary* 573 (unabridged ed 2002)). Thus, for the juvenile court to have jurisdiction over a child pursuant to ORS 419B.100(1)(c), the child's condition or circumstances must give rise to a threat of serious loss or injury to the child. The threat must be current. *State v. S. T. S.*, 236 Or App 646, 654, 238 P3d 53 (2010) (the state must prove 'that there is a *current* risk of harm and not simply that the child's welfare was endangered at some point in the past' (emphasis in original)). And, there must be a reasonable likelihood that the threat will be realized. *State ex rel Juv. Dept. v. Vanbuskirk*, 202 Or App 401, 405, 122 P3d 116 (2005) (reasoning that the 'key inquiry in determining whether "condition[s] or circumstances" warrant jurisdiction is whether, under the totality of the circumstances, *there is a reasonable likelihood of harm to the welfare of the child*')."

*A. F.*, 243 Or App at 385-86 (first emphasis in original; second emphasis added). The two formulations complement each other and correctly state the standard. But even if we were to conclude that the *Smith* standard is significantly less demanding than the *A. F.* standard, we would nonetheless conclude that DHS failed to meet either.

In March 2010, DHS filed a dependency petition regarding I, then nine years old, and A, then three. After a shelter hearing, the juvenile court granted legal custody to DHS and ordered placement in mother's care. Shortly thereafter, the court took jurisdiction over the children based on mother's stipulations to two allegations: that mother had, at times, failed to provide adequate supervision of her children while the children were in her care, and that mother's substance abuse, if left untreated, impaired her judgment and ability to provide safe, consistent, and appropriate care of the children. A review hearing before a referee occurred approximately 14 months later, in July 2011. Mother moved to terminate the wardship; the referee denied the motion. At a subsequent hearing before a judge, the referee's decision was affirmed. This appeal ensued.

DHS presented no evidence that mother's substance abuse continued, nor does the department rely on that allegation here; the decision rested entirely on the conclusion that the conditions underlying mother's failure to provide adequate supervision persisted. That conclusion, in turn, rested on the following facts: (1) Mother had a telephone conversation in the presence of I (and a court appointed special advocate (CASA)) in which she discussed aspects of her former activities as a professional "escort" (although there is nothing in the record to indicate that mother ever engaged in unlawful activity); (2) Mother discussed her work as a dancer in front of I, but, when informed that such information was not appropriate, promised to "make [an] effort to make sure that she didn't talk about it anymore in front of" I; (3) Mother allowed I to receive expensive gifts from an adult male known only as Uncle Woody (although there is nothing in the record to indicate that this man was not, in fact, I's (or mother's) uncle); (4) Mother did not adequately monitor I's Internet use, although she warned I about the dangers of Internet predators and instructed her never to provide personal information over the Internet; (5) A appeared "healthy, happy, well-cared for"; (6) Mother completed substance abuse treatment and completed a Family Skill Builder program of parenting classes, achieving what the instructor termed a "minimally adequate" level of parenting skill (although the instructor also recommended further training); (7) I hugged

her male therapist the first time she met him, but "stopped immediately" when the therapist expressed concerns.

Based on these facts, a DHS caseworker who, six days before the review hearing, had recommended that wardship be terminated due to a lack of "a basis for continued involvement," nonetheless observed that mother's judgment continued to be "questionable" and that mother could "benefit from continued supervision"; the case worker testified at the hearing that she had "concerns about the supervision that the kids are getting." DHS, as well as the children's attorneys and CASAs agreed, expressing particular concerns over I's potential vulnerability based on "poor boundaries with men" as demonstrated by her hugging her therapist and her receipt of gifts from the man known as Uncle Woody.

It is possible that the juvenile court's conclusions regarding mother's supervision derived from mother's affect at the hearing or from some *in camera* discussions—apparently, in one such discussion, somebody referred to mother taking I on a "stripper run," but there is no testimony as to whether that actually occurred or what a "stripper run" involves. Our review, however, is limited to the record before us. On this record, we conclude that, although mother may or may not have been an ideal parent, at the time of the review hearing, there is *no* evidence underlying the decision to maintain wardship over A, and the evidence regarding mother's supervision of I cannot support the conclusion that she exposed the girl to "a reasonable likelihood of harm," much less a current threat of serious loss or injury. Exposure to a parent's unconventional but not unlawful lifestyle, receipt of lavish gifts from a parent's friends or relatives, and an unspecified amount of unsupervised access to the Internet do not justify state intervention into a parent's fundamental right to the care, control, and custody of her children.

Reversed.