Submitted May 28, reversed June 24, 2015

In the Matter of M. P. H.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

M. A. H.,
*Appellant.*

Douglas County Circuit Court
1400203;
Petition Number 14JU227;
A158399

354 P3d 738

Peter Gartlan, Chief Defender, and Valerie Colas, Deputy Public Defender, Office of Public Defense Services, filed the opening brief for appellant. Shannon Storey, Chief Defender, Juvenile Appellate Section, and Valerie Colas, Deputy Public Defender, Office of Public Defense Services, filed the reply brief for appellant.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Jeff J. Payne, Senior Assistant Attorney General, filed the brief for respondent.

Before Duncan, Presiding Judge, and Lagesen, Judge, and Flynn, Judge.

LAGESEN, J.

**LAGESEN, J.**

The juvenile court determined that 21-month-old M's "condition or circumstances" created a current "threat of serious loss or injury to the child," so as to warrant the exercise of dependency jurisdiction under ORS 419B.100(1)(c).[1] M's mother appeals from the dependency judgment, assigning error to the trial court's conclusion that M's circumstances at the time of the jurisdictional hearing demonstrated that she would be endangered absent the exercise of juvenile court jurisdiction.[2] We reverse.

Neither party requests *de novo* review, and we decline to exercise our own discretion to do so. Thus, we review the juvenile court's jurisdictional determination under ORS 419B.100(1)(c) as follows:

> "[W]e: (1) assume the correctness of the juvenile court's explicit findings of historical fact if these findings are supported by any evidence in the record; (2) further assume that, if the juvenile court did not explicitly resolve a disputed issue of material fact and it could have reached the disposition that it reached only if it resolved that issue in one way, the court implicitly resolved the issue consistently with that disposition; and (3) assess whether the combination of (1) and (2), along with nonspeculative inferences, was legally sufficient to permit the trial court to determine that ORS 419B.100(1)(c) was satisfied."

*Dept. of Human Services v. N. P.*, 257 Or App 633, 639-40, 307 P3d 444 (2013). Consistent with that standard of review, we draw the historical facts from the juvenile court's explicit factual findings; as necessary, we supplement those facts contained in the trial court's explicit findings

---

[1] ORS 419B.100(1)(c) provides that "the juvenile court has exclusive original jurisdiction in any case involving a person who is under 18 years of age and *** [w]hose condition or circumstances are such as to endanger the welfare of the person or of others."

[2] The court also took jurisdiction as to M's father. Mother and father were separated at the time of the hearing, and mother had legal custody of M. The court took jurisdiction as to father on the ground that father's lack of a custody order endangered M, because father could not protect M from mother. The court indicated that it was finding jurisdiction as to father so as to provide father with "the assistance of the agency to protect the child from" the environment of mother's home "while the parents are getting their help."

with additional facts drawn from the record that are either uncontested or consistent with the juvenile court's ultimate disposition.

Mother was 36 years old at the time of the hearing in November 2014. Mother has suffered from depression throughout her life and has been treated for it with medication and counseling. Mother separated from father shortly before M's birth in February 2013. As a result, mother parented M by herself from the time that M was born to the time that M was removed from mother's home in July 2014. Mother had legal custody of M. M was mother's first and only child, and the transition to motherhood was difficult for mother. A few days before M was born, mother expressed concern to her own mother (grandmother) and to father that she might harm her baby. Mother did not intend to harm her child, but made that statement because she was scared about the process of giving birth, and wanted attention from grandmother and father. Grandmother and father contacted the Department of Human Services (DHS), and mother was hospitalized and evaluated. As a result of that process, mother was provided with six weeks of counseling, in which she participated.

In November 2013, when M was approximately nine months old, mother left M in the car while mother went into a store. Mother left M alone for approximately 20 minutes. DHS was contacted as a result of the incident but did not take any action.

Mother relied on grandmother and grandmother's husband to help her with M. They would watch M for mother and, at times, when M would cry, they would talk to M on the telephone to soothe her. At the time DHS removed M from mother's care, M was physically healthy in all respects and her height and weight were at the top of the charts for her age. M was clean and appeared to be well-cared for; mother's house was clean and stocked with appropriate food and toys for M.

DHS removed M from mother's care after receiving a call from grandmother. In the month or so leading up

to M's removal,[3] mother left voicemail messages for grand-mother, and sent text messages as well, often when mother was not able to reach grandmother for assistance with M. On May 24, 2014, mother text messaged grandmother:[4]

> "Yes u're right. My dog has leprosy & I am a serial killer (or violent schizophrenic) we're dangerous to both u & my daughter & I might just sacrifice her."

She continued:

> "2 the devil. R u happy now—u figured us out! I & my dog r the devil's children & my daughter has no chance w/ur god. Ho hum. I'll pray to YOU from now on."

She also text messaged:

> "ok? U or Ilein-u both seem to be holier than thou. (Rolling my eyes...) I'll take my chances w/ur heartless god! Goodnight/day 2 u hypocritical plus fana."

On June 1, 2014, mother text messaged:

> "If u don't have the energy either I'd understand. There's only 1 othr person who's willing 2 take her full-time. I don't have enuf time 2 recuperate & she"

She also text messaged:

> "Then u wont have 2 expend ur energy or have 2 worry about her. U'll feel better when her father takes here. Then if u or my father want 2 see her, u can contact him & see how that works out. I nevr wanted 2 b a parent-NEVER!"

On July 12, 2014, mother text messaged:

> "She cries every single day for hours. We tried calling u so maybe u can comfort her but both your cell phones discon-nected me. She cried so much her chest is soaked in tears. "Too bad nobody cares" I told her. She's all on her own. If

---

[3] The precise timing of the voicemails and text messages is not clear from the record or critical to the trial court's findings and conclusions. Mother testified that she thought that they covered the period of time from May 2014 until shortly before M's removal. Grandmother's testimony suggests that the messages, for the most part, arrived shortly before she contacted DHS.

[4] The text messages were introduced into evidence through photographs of them on cell phones. The photographs do not always capture the entirety of mother's text messages. In quoting the text messages, we have omitted portions of sentences when the entire sentence is not captured in the photograph of the text message.

the P.D./DHS comes 2 pick her up, I'd willingly give them her clothes & diapers & never care 2 see her again. Much like I dont want 2 see her when u have her."

During the same period of time, mother also had a text message exchange with father; the exchange indicates that mother and father were having difficulties negotiating the terms of their separation and had some hostility toward each other.

It is not clear from the record exactly when mother left the voicemail messages, although the trial court could have inferred that they were left on different days. Some of the messages are just short clips of M crying. In one of the voicemail messages, mother stated:[5]

"This message is for anybody who cares. [M]'s hungry and thirsty I'm sure. She's crying. It's 3:00, 3:30, she hasn't had anything to eat or drink today. [Unintelligible]. I'm taking the day off. So I don't know how she's gonna eat or drink or be changed or whatnot. She's running around here kind of crying. So I don't know if anybody there cares. But she's, you know where to find her."

In another voicemail, mother states that M had not eaten since the previous day. In another, M is heard crying while mother states:

"Nobody's cares, nobody answers, there's nobody there for you little girl. Nobody. Nobody. Not your poppa, not your momma, not your grandpa, grandma, nobody, not DHS, not the police department. You're just gonna have to sit there and cry it out. Your doctor said it's okay for you to cry it out. [Unintelligible]. It doesn't help with anything [unintelligible] before you stop [unintelligible] yeah, yeah."

Ultimately, grandmother contacted DHS after mother refused to let grandmother into her house when grandmother, after having been out of town, went to see mother. That worried grandmother and she was concerned because, while she was out of town, she had not responded

---

[5] The voicemails were entered into evidence as an exhibit on a CD. That exhibit was played in court, and the transcript reflects the content of the voicemails. There are some discrepancies between the transcript of the dependency hearing and the CD exhibit as to the content of the voicemails. We have drawn the content of the voicemails from the audio CD that was entered into evidence.

to phone calls or text messages from mother, or checked her voicemail. When grandmother finally checked her messages, she discovered that mother had left her voicemails while she was gone. After grandmother contacted DHS, two caseworkers came to grandmother's home. Grandmother played the voicemails for them and showed them the text messages. The three then went to mother's home, and mother let them in when they knocked. Mother and M were watching a children's show on mother's laptop at the time. The DHS workers talked to mother and removed M. M initially was placed with grandmother and then was placed with her father. Mother was allowed visitation throughout on varying terms. DHS filed a dependency petition the day after removing M from mother. The petition alleged the following bases for juvenile court jurisdiction:

"(a)  [Mother's] mental health problems interfere with her ability to safely parent the child.

"(b)  [Mother] fails to provide adequate food for the child.

"(c)  [Mother] subjects the child to mental, verbal and emotional abuse.

"(d)  [Father's] mental health problems interfere with his ability to safely parent the child."

After M was removed, mother continued in counseling with the therapist that she had been seeing since January 2014. Around the time of M's removal, mother's therapist had been in the process of adjusting her antidepressants, and mother continued with that process. Mother also participated in a Dialectical Behavior Treatment group almost every week, to help her with her "emotional regulation." In September 2014, mother's therapist notified DHS that she thought mother was in a position to focus on parenting M.

A month later, a psychologist, Dr. Truhn, conducted a complete psychological evaluation of mother at the request of mother's attorney. He diagnosed her with "major depressive disorder that was moderate, with anxious distress, moderate to severe, and borderline dependent, narcissistic and histrionic personality features." Truhn conducted a battery

of tests on mother which indicated, among other things, that mother had "solid" intellectual abilities and that mother did not share the profile of known physical child abusers. Truhn concluded that mother's "personality issues" could be an "issue" with mother's ability to safely parent "if untreated and in the long term if there were ongoing verbal abuse or angry outbursts or unstable relationships essentially putting her needs above the needs of the child." Specifically, Truhn thought that if mother engaged in the type of conduct that led to M's removal "consistently and as the child would mature, that it could affect the child in a long-term situation" in a negative way. Truhn did not believe that mother's mental health issues impaired her ability to safely parent at the current time, but thought that they "could" do so in the future if mother did not continue with treatment.

The hearing on the jurisdictional petition was held in November 2014, four months after DHS removed M from mother. It had originally been scheduled for September 2014, but was set over—over mother's objection—because DHS wanted father to take steps to obtain legal custody of M, so that DHS could dismiss the dependency case.[6] The hearing was rescheduled for October but was set over again—again, at DHS's request and over mother's objection. DHS stated at the October hearing that it had planned on dismissing the case and letting the case just "turn[] into a custody case" between mother and father, but, upon receiving Truhn's psychological evaluation from mother's attorney the day before the hearing, DHS changed its mind about dismissing the case because it wanted time to review the evaluation.

At the November hearing, DHS amended the petition to eliminate the allegation that father's mental health issues interfered with his ability to safely parent M. It added the following allegation:

> "[Father] does not have legal custody of the child and cannot protect the child from Mother removing the child from his home, which is a safety threat."

---

[6] The court took testimony from one witness in September; mother's father had traveled to Oregon from Puerto Rico for the hearing, but had to return home. The court permitted him to testify about his observations of his daughter's parenting of M.

In support of its contention that M's circumstances endangered her, DHS relied primarily on the circumstances existing up until July 2014 to demonstrate that M's circumstances—in particular, mother—posed a risk to M. DHS contended that (1) mother's suggestion before M's birth that she might hurt her unborn child, (2) mother's act of leaving M in the car at the store, and (3) mother's texts and voicemails to grandmother and to father demonstrated that mother posed an ongoing risk to M. DHS did not introduce any evidence indicating that mother had engaged in conduct after July 2014 that gave rise to any concerns for M's safety.

At the end of the hearing, the juvenile court concluded that jurisdiction was warranted. Although the court found that mother had no intent to hurt her child, the court concluded that mother had hurt M by "subject[ing] her to horrible, intense emotions, and le[aving] her—she wasn't screaming just because she wanted to annoy you, that was really unhappy wailing, really unhappy, scared, who knows what all emotions she was feeling, but I suspect she was feeling probably pretty scared, pretty abandoned[.]" The court also concluded that mother's mental health issues caused her to seek help with M in inappropriate, "unhealthy" ways, and to say inappropriate things. The court further concluded that the fact that mother vocalized inappropriate thoughts put her "one step closer to actually doing the inappropriate thing." The court explained that it believed that mother needed to learn to not say "hateful, ugly, hurtful things you can't take *** back," particularly around M, because "what you do and what you say impacts other people, especially your child, who, whether you say it to her in a way she understands, if you're doing it around her, she feels it, she feels it." The court ultimately concluded that, in the light of the risks mother posed to M, father's lack of a custody order put M at risk because that would mean, if the dependency case was dismissed, that M would be returned to mother.

On appeal, mother contends that the trial court erred when it concluded that M's conditions and circumstances endangered her at the time of the hearing, so as to warrant jurisdiction. We agree.

For a court to take jurisdiction of a child under ORS 419B.100(1)(c), the child's "condition or circumstances" *at the time of the jurisdictional hearing* must be such as to endanger the welfare of the child or another person. *Dept. of Human Services v. S. P.*, 249 Or App 76, 84, 90-91, 275 P3d 979 (2012). A child's condition or circumstances "endanger" the child within the meaning of the statute if they "create a current threat of serious loss or injury to the child," and the threat is one that is "reasonably likel[y]" to be realized absent juvenile court intervention. *Id.* at 84 (internal quotations omitted); *Dept. of Human Services v. W. A. C.*, 263 Or App 382, 402-03, 328 P3d 769 (2014).

Here, that standard was not met. At the outset, we note that the juvenile court found affirmatively that mother did not have the motivation or intent to harm M. Beyond that, the historical facts in the record do not permit the conclusion that M faced a current threat of serious loss or injury from mother at the time of the jurisdictional hearing. We acknowledge that mother's text messages and voicemails, combined with mother's mental health history, gave DHS reason to be concerned for M's welfare at the time that grandmother contacted DHS in July 2014. The messages clearly demonstrate that mother was struggling in late spring and early summer 2014 with the significant challenge of parenting a toddler on her own. However, the messages, together with the other historical facts about mother and her parenting of M, do not permit the conclusion that mother posed "a current threat of serious loss or injury" to M that was reasonably likely to be realized without juvenile court intervention at the time of the jurisdictional hearing four months later.[7]

---

[7] We note that the text and voicemail messages, while concerning, provide little information about M's conditions and circumstances while in mother's care. The text messages were sent sporadically across a span of time from May to July 2014. Each appears to represent one side of a conversation that mother was having with grandmother; without the other side of the conversation, it is not possible to infer much about mother's parenting—and the risks she poses to M—from those messages. The voicemails also demonstrate little about M's circumstances. They provide only a narrow window into mother's parenting of M as a whole, in that they capture on audio brief moments of mother's parenting, and they do not show that mother routinely neglected M while she was crying or that mother routinely said inappropriate things to M. If anything, they suggest that mother reached out to her parents for assistance in soothing M when she was unable to

It is possible that the text messages and voice-mails might have permitted the conclusion in *July 2014* that mother's mental health issues and her "emotional abuse" of M jeopardized M's welfare at that point in time, but that is not the question presented in this case. Again, to establish jurisdiction, DHS was required to demonstrate that M's circumstances in *November 2014* endangered her welfare. *S. P.*, 249 Or App at 90-91. Although there are certainly cases in which the child's circumstances four months earlier will permit the conclusion that the child's welfare is presently endangered, the evidence here is insufficient to support a conclusion that the danger to M—if any—that existed in July continued to be present in November, even when the record is viewed in the light most favorable to the trial court's ruling. First, we note that the record contains no evidence that would permit the conclusion that M was, in fact, harmed by mother's conduct in any nonspeculative way. Notwithstanding mother's concerning voicemail and text messages, M's medical records show that M was healthy and meeting developmental milestones at the time that she was removed from mother's care. The DHS caseworkers who removed M from mother's care testified that M's living conditions were clean and appropriate.

Second, this is not a case in which evidence of mother's past mental health issues alone are sufficient to support an inference of her present condition. The evidence is uncontroverted that mother continuously has made efforts to eliminate any risk of harm to M posed by mother's mental health issues. When mother became concerned before M's birth that she might harm M, she communicated those concerns to grandmother and to father, and they were able to obtain help for mother. Further, at least since M's birth, mother continuously has made efforts to address her mental health issues. It is undisputed that, after M was removed

---

do so herself, evidencing a concern for M's well-being. Although mother's statements to M in the last voicemail message to the effect that "nobody" was there for M—the conduct on which we understand the juvenile court primarily to have based its determination that mother engaged in "emotional abuse" of M—could appropriately be characterized as abusive in terms of content, the recording of the voicemail reflects that mother uttered the statements in what could be described as a calm tone, and there is no evidence that M understood what mother was saying to her.

from her care, mother continued to participate in counseling and seek help for her mental health conditions. As of November 2014, mother was continuing to participate in counseling and therapy, and her medication for her depression appeared to be working. Although, as DHS points out, mother's participation in counseling did not stop her from engaging in the conduct that the agency found objectionable in July, the only mental health professionals to testify confirmed that, as of the date of the hearing, mother's mental health issues were being managed.

Third, and relatedly, the historical facts do not allow for the conclusion that the management of mother's mental health issues in November 2014 was so inadequate that mother's mental health conditions posed a serious threat to M or that mother was likely to continue to make the type of statements to M that the juvenile court deemed emotionally abusive. Mother's therapist confirmed that mother was participating in therapy and doing well, and that mother's long-term therapy plan was to work on addressing the topics that Truhn identified in his evaluation of mother. As noted, Truhn testified that as long as mother continued to work to address her various mental health issues, mother did not present a risk of serious harm to M. Truhn's only concern was that that mother's mental health condition might put M at risk of harm—in the form of verbal abuse—*in the future*, if mother did not continue with counseling. DHS introduced no evidence controverting those opinions, opting instead to rely primarily on mother's voicemail messages and text messages to demonstrate that mother posed a risk to M at the time of the November hearing.

Under those circumstances, the trial court erred in concluding that mother's mental health issues or her prior conduct in July 2014 posed a *current* threat of serious loss or injury to M at the time of the jurisdictional hearing in November 2014. Consequently, father's lack of a custody order at that time also did not endanger M; father's lack of custody endangered M only if mother, as the custodial parent, posed a risk to M.

Reversed.