AOYAGI, J.
*709 The juvenile court asserted dependency jurisdiction over J, an eight-year-old girl, based on mother's failure to protect J from *777 father, mother's mental health condition, and father's stipulated unavailability to parent. Mother appeals the judgment. Mother does not contest that she failed to protect J when J told her that father, who had sole custody of J and was her residential parent, had sexually abused her. She also does not contest that her untreated mental health condition, along with her own history as a victim of sexual abuse, contributed to her not handling the situation appropriately. Mother argues, however, that at the time of the jurisdictional hearing her mental health had substantially improved, she deeply regretted her handling of the situation, and she knew what to do if a similar situation occurred again. Also, father was under a no-contact order, and mother was planning to request a change in J's custody. As a result, mother contends, J was no longer exposed to a current risk of serious loss or injury that was likely to be realized. For the reasons that follow, we agree with mother that, at the time of the hearing, the evidence was insufficient to take jurisdiction. Accordingly, we reverse.
On appeal of a jurisdictional judgment, we determine whether, on the record before it, the juvenile court erred in making the statutorily prescribed determination. Dept. of Human Services v. N. P. , 257 Or. App. 633, 639, 307 P.3d 444 (2013). We view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the juvenile court's disposition and assess whether, when so viewed, the record was legally sufficient to permit the outcome. Id . We state the facts in accordance with that standard.
In 2009, mother, who has a history of alcohol abuse and mental health issues, gave birth to J. As a result of mother's alcohol abuse, father was awarded sole custody of J. Mother was given two days of parenting time each week. Otherwise, J lived with father and his parents.
When J was seven years old, J told mother in early February that "some weird things" had happened at father's house. After mother urged her to explain what she meant, *710 J disclosed to mother that father had sexually abused her. The record is silent as to what exactly J told mother, but the parties agree that whatever J said was enough to constitute a disclosure of sexual abuse. Mother testified that she was "so shocked" by this information that her "whole body just stopped" and she did not know what to do. Mother, who had been sexually abused herself by a family friend once when she was about nine years old, knew that sexual abuse is a crime and knew that crimes should be reported to the police. She did not, however, call the police. Instead, knowing that teachers are mandatory reporters, mother told J to tell her teacher. Mother later returned J to father's care in accordance with the custody order.
When J came back to mother's house the following week, mother asked J whether she had told her teacher. J said that she had not. At that point, mother made a video recording of J describing what father had done. Mother again told J to tell her teacher, but she still did not call the police herself, and she again returned J to father's house according to the custody schedule. The record is silent as to whether any abuse occurred after J's initial disclosure to mother.[1]
On February 21, J reported father's sexual abuse to a teacher. The school contacted DHS. While DHS and the police investigated, J was placed with mother. Mother was depressed and upset about everything that was happening. A few days after J was placed with mother, while J was playing at a neighbor's house, mother drank alcohol and took Benadryl in an apparent suicide attempt. Mother was admitted to the hospital for treatment. She told a DHS caseworker that "everything that was going on regarding the child welfare and criminal investigation pertaining [to father] was too much for her to handle." At that point, DHS placed J with her maternal grandparents. Around the same time, the state instituted criminal charges against father, which resulted in a no-contact order as a condition of father's pretrial release, and DHS filed a petition for the juvenile *778 court to assert jurisdiction over J under to ORS 419B.100. *711 As a result of those events, mother voluntarily sought treatment for alcohol abuse and began mental health counseling. At the time of the jurisdictional hearing in August, mother had been meeting regularly with her counselor for five or six months, had completed an alcohol treatment program, and had not used alcohol for five or six months. She had a good relationship with the counselor and intended to continue therapy for the rest of her life. One of the topics mother was discussing with the counselor was her own sexual abuse history and how it contributed to her reaction in February. Mother also was taking medications to treat depression, anxiety, and attention-deficit disorder. Mother testified at the jurisdictional hearing that she had made a lot of progress on her mental health and never wanted to go back to how she felt before.[2] Mother also had completed a twelve-week parenting course and was willing to engage in other services, but the parenting course was the only referral that she had received from DHS. While mother worked on her mental health and parenting skills, she visited J regularly.
Mother has a difficult relationship with her own mother (grandmother). On June 30, mother and grandmother exchanged text messages. Grandmother used profanity and criticized mother for lacking motivation and having *712 an unhealthy lifestyle. Mother responded that "me being alive * * * and sane is all that matters" and that J "would be even sadder if I'm dead so please stop." She concluded the text string, "I don't ever want to be awake right now I'm going back to bed"; mother later testified that it was supposed to say "even," not "ever," but auto-fill changed it. Grandmother reported mother's statements to DHS as a suicide threat. At a team meeting at DHS two weeks later, mother agreed that she was very emotional and struggling to maintain her mental health but denied making a suicide threat. Mother's parents refused to participate in family counseling, and J was eventually placed with her paternal grandparents.
The jurisdictional hearing took place in August 2017. Father stipulated that he was unavailable as a custodial resource due to the no-contact order and pending criminal charges, at which point the other jurisdictional allegations regarding father were dismissed. As for mother, DHS alleged three bases of jurisdiction: (A) mother's mental health problems, if left untreated, interfere with her ability to safely parent;[3] (B) mother's substance abuse interferes with her ability to safely parent; and (C) mother failed to protect J when mother became aware of the allegations against father. Before the hearing began, DHS voluntarily dismissed allegation (B), because mother had successfully completed alcohol abuse treatment and was willing to engage in ongoing sobriety testing.
*779 The hearing therefore was limited to allegations (A) and (C).
DHS called three witnesses, each of whom testified only briefly. Roeder, a DHS caseworker, testified that she received the case after J disclosed abuse to her school and that, after mother's hospitalization in February, mother told Roeder that she drank alcohol and took Benadryl to cope with anxiety related to J's abuse. Fessler, a DHS caseworker who took over the case from Roeder, testified about mother's positive engagement with mental health services and parenting classes, mother's strained relationship with her own mother, and "very recent" concerns about domestic violence *713 toward mother. Espelding, a hospital social worker, testified that mother was alert in the hospital in February and told her that she was under stress due to J's sexual abuse allegations. Mother testified on her own behalf.
The juvenile court stated repeatedly during the hearing that it did not consider five or six months of sobriety and mental health counseling and a twelve-week parenting course a "magic wand" that solved everything. During mother's testimony, the court told mother that she needed to earn the court's trust and that, although it recognized that she was working on her mental health, "life is a journey and like you just don't take one pill, just don't take one set of classes and say, ho ho, ollie, ollie, I'm free, I'm okay." Mother agreed and explained that that was why she had been working on her mental health for the past five or six months and that she was doing much better than she had been. During the DHS caseworker's testimony, the court asked whether it could take a very long time for mother to come to terms with her own history of sexual abuse and "unwind the rest of the ball of yarn that comprises her life," and the caseworker said yes. Asked by the court if that was why DHS wanted to stay involved, the caseworker again said yes, and the court commented, "It's really not that complicated."
At the conclusion of the hearing, the juvenile court concluded that DHS had proved the allegations. It explained its assertion of jurisdiction as follows:
"This is a cycle that has been ongoing for a long time for which mom has not really fully followed through with anything that first brought her into the court system. She never successfully completed the stuff required by driving under the influence. She continued to drive. She had a judgment in the custody case where she got less than a third of the time as a parent. Never really came back to the court to show that other things had been done, that she should have more or ask for changes like that. A couple of contempt proceedings associated with failure to pay child support.
"And the very unfortunate pervasive obvious issue with regard to the mental health was that mom gets brought to the hospital by her boyfriend of three years, who I wouldn't give him any hard time about being angry with her for *714 being drunk on her off time. Low self-esteem in many respects. Life is really hard. A lot of feel sorry for myself kind of I hear coming out of that, and that somebody owes her something. And then when things don't go her way by gosh, darn, I'm going to talk about ending my life. You watch it's a wonderful life too many times.
" * * * * *
"The ongoing situation is the mental health problems that are deep seated and you know they are, we've talked about it, the complexity, need to be peeled back a little better, or really gotten a better hold of. And that interferes with your ability to safely parent.
"Those mental health issues Ms. Fessler brought up were part and parcel of mom's failure to protect. And they are capable of being repeated, I believe, in relatively short order. You have been on and off the alcohol and drugs for a fairly lengthy period of time. I don't want you to get back on. I'd just as soon you stay on the wagon. Okay?
"But I'm going to find that [J] is within the jurisdiction of the Court as to allegations 2A and 2C. And then whatever you want to put those stipulating to the requirements. I just want her to stay clean."
*780 The court entered a judgment of jurisdiction, which mother appeals.
The juvenile court has jurisdiction over a child whose "condition or circumstances are such as to endanger the [child's] welfare." ORS 419B.100(1)(c). For the court to take jurisdiction, DHS must present evidence "sufficient to support a conclusion that the child's condition or circumstances expose the child to a current threat of serious loss or injury that is likely to be realized." Dept. of Human Services v. A. W. , 276 Or. App. 276, 278, 367 P.3d 556 (2016). DHS must establish the "type, degree, and duration" of the harm. Dept. of Human Services v. S. D. I. , 259 Or. App. 116, 123, 312 P.3d 608 (2013). When the risk is caused by a parent's behavior, DHS must establish a nexus between the parent's allegedly risk-causing conduct and the harm to the child. Dept. of Human Services v. C. J. T. , 258 Or. App. 57, 62, 308 P.3d 307 (2013). The risk of harm must be "nonspeculative"; that is, there must be "a reasonable likelihood that the threat will *715 be realized." Dept. of Human Services v. A. L. , 268 Or. App. 391, 397, 342 P.3d 174 (2015).
The two challenged jurisdictional bases are intertwined, so we discuss them together. Mother does not contest that she failed to protect J in February when J disclosed that father, who had sole custody of J, had sexually abused her. Mother also does not contest that her untreated mental health condition, along with her own history of sexual abuse, contributed to her reaction in February. Mother argues, however, that, at the time of the jurisdictional hearing, the evidence was that her mental health had substantially improved as a result of regular counseling, prescribed medication, and alcohol abuse treatment and that she would handle the situation much differently if it ever arose again. DHS responds that, notwithstanding the change in J's circumstances vis-à-vis mother, mother's history of depression, anxiety, and substance abuse "affects her ability to respond appropriately to child's circumstances" and that "it is clear that mother would still be unable to respond appropriately to J's future requests for help."
On this record, we agree with mother that the evidence was insufficient for the juvenile court to conclude that, at the time of the jurisdictional hearing, mother's current mental health condition and her failure to protect J six months earlier exposed J to a current threat of serious loss or injury that was likely to be realized. Juvenile dependency proceedings are not punitive in nature. Their sole purpose is to protect children. Although the conduct, condition, or circumstances of one or both parents is often what gives rise to jurisdiction over a child, the juvenile court's focus at the jurisdictional hearing must be "on the child's conditions or circumstances at the time of the hearing and whether the totality of those circumstances demonstrates a reasonable likelihood of harm to the welfare of the child." Dept. of Human Services v. W. A. C. , 263 Or. App. 382, 393, 328 P.3d 769 (2014) (emphasis added). The focus is always on the child and whether there is a current, nonspeculative risk of harm to the child. Id . Moreover, "a risk of some harm" is not enough: "the type, degree, and duration of the harm must be such that exposure to a reasonable likelihood of that harm justifies juvenile court jurisdiction."
*716 Dept. of HumanServices v. K. C. F. , 282 Or. App. 12, 17, 383 P.3d 931 (2016) (first emphasis in original; second emphasis added; internal quotation marks omitted).
Here, DHS's failure to identify the specific "type, degree, and duration" of the harm that it sought to establish complicates our review. Id . The harm at issue is a fundamental part of DHS's case and is important both to the juvenile court's analysis and to our review. See K. C. F. , 282 Or. App. at 17, 383 P.3d 931 ; A. L. , 268 Or. App. at 397, 342 P.3d 174 ; S. D. I. , 259 Or. App. at 123, 312 P.3d 608 ; C. J. T. , 258 Or. App. at 62, 308 P.3d 307. When DHS fails to identify a specific type of harm, and instead relies on an amorphous risk of unspecified harm loosely tied to multiple allegations, it hinders parents' ability to fully respond to the state's case. It hinders the juvenile court in making appropriate fact findings and assessing whether DHS has proven its case. And it makes it difficult for us to review whether there is any evidence to support the alleged nexus between the parent's conduct and the specific harm at issue, *781 C. J. T. , 258 Or. App. at 62, 308 P.3d 307, as well as whether there is any evidence of a reasonable likelihood of that specific harm occurring or whether it is speculative, A. L. , 268 Or. App. at 397, 342 P.3d 174.
In this case, based on the allegations in the petition and the circumstances giving rise to the petition as described at the hearing, we understand that DHS sought to prove that, absent dependency jurisdiction, J would be exposed to ongoing risk of abuse from which mother would fail to protect her, in part due to mother's mental health issues.[4] With that in mind, we turn to the record.
*717 DHS put on evidence-and mother does not contest-that mother failed to protect J in February and exposed her to a nonspeculative risk of serious harm when she did not immediately report J's abuse allegations to the police or DHS and allowed J to continue living in father's house for two to three weeks. At the time of the jurisdictional hearing six months later, however, J's circumstances had substantially changed in a variety of undisputed ways. J had been removed from father's home. Father was subject to a no-contact order and facing criminal charges with the prospect of a lengthy prison term. Mother was planning to request a custody change even if father was not convicted. Meanwhile, mother had stopped drinking and voluntarily completed alcohol treatment, which caused DHS to dismiss substance abuse as an alleged basis for jurisdiction. Mother also had been working for five or six months with a mental health counselor with whom she had a good relationship, and she planned to continue therapy for the rest of her life. She was taking medications for anxiety, depression, and attention-deficit disorder. She had completed the twelve-week parenting course recommended by DHS. She expressed remorse about her failure to protect J in February and described herself as "heartbroken" about it. In a similar situation in the future, she testified, she would not make the same mistake and would immediately call the police or DHS.
*718 DHS does not contest the changes mother had made. It suggests that they are in some way less meaningful because it was the events of February and DHS's ensuing involvement that motivated mother to stop drinking and improve her mental health. What matters for jurisdictional purposes, however, is how the changes *782 that mother had made affected the current threat of harm to J, not whether it would have been better if mother had made them sooner. DHS offered no evidence that the changes mother had made were less likely to be durable because of what motivated them.
In Dept. of Human Services v. D. M. , 248 Or. App. 683, 275 P.3d 971 (2012), the mother stipulated to jurisdiction over her children based on failure to supervise and untreated substance abuse problems. After the mother stopped using drugs for several months and completed parenting classes, she sought to terminate the court's wardship. DHS opposed the petition, arguing that the mother was still unable to safely care for the children. It offered evidence that the mother had received a "minimally adequate" grade in the Family Skill Builder program, had discussed her work as an exotic dancer in front of one child, and did not monitor the children's internet use. The juvenile court denied the mother's petition. We reversed, explaining that, "although mother may or may not have been an ideal parent," the evidence could not support the conclusion that the children were exposed to a current threat of serious loss or injury that was reasonably likely to be realized. Id . at 688, 275 P.3d 971. The evidence was insufficient to "justify state intervention into a parent's fundamental right to the care, control, and custody of her children." Id .
By contrast, in Dept. of Human Services v. T. S. , 214 Or. App. 184, 164 P.3d 308 (2007), the juvenile court asserted jurisdiction over four children after the oldest child K, a 14-year-old girl, disclosed to DHS that her father had sexually abused her for years. DHS offered evidence at the jurisdictional hearing that K had told her mother about the abuse three years earlier but that the mother did not believe K and was hostile toward K after she made the allegations. The mother knew that the father had been investigated previously for sexually abusing his 12-year-old stepdaughter and *719 his 6-year-old daughter by another woman, and she knew that the father had written a fictional book that described in graphic detail a father raping his young daughter and other children. The mother did not believe that the father had sexually abused anyone, however, and took no steps to protect K or the other children. We affirmed the jurisdictional judgment, concluding that, despite the mother's explanations for believing the father, the totality of the circumstances established that the children faced a current risk of sexual abuse by their father that was reasonably likely to occur and from which their mother was not protecting them.
Unlike the mother in T. S. , there is no evidence that mother ever disbelieved J. She took some steps to stop further abuse, albeit woefully inadequate steps. Because of the inadequacy of mother's response, which was driven in part by her untreated mental health issues, the burden was improperly put on a young girl to disclose sexual abuse to a second adult, and J was exposed to two to three weeks of unnecessary risk of an extremely serious harm. At the time of the jurisdictional hearing, however, J's circumstances had changed. Mother had stopped drinking, which resulted in DHS dropping the jurisdictional allegation regarding substance abuse. Mother also had taken substantial steps to improve her mental health, including fully engaging in therapy and taking medication, which is especially significant because the jurisdictional basis was that "mother's mental health problems, if left untreated , interfere with her ability to safely parent." (Emphasis added.) Finally, mother expressed remorse about how she had handled the situation in February and testified that she would call the police or DHS immediately if a similar situation arose in the future. Meanwhile, father was out of the picture for the foreseeable future (and possibly the rest of J's childhood), and DHS did not identify anyone else in J's life as posing a risk of abuse. The juvenile court did not find that mother was not credible-rather, it indicated only that it wanted to see her sustain her success for a longer period of time.
It is always possible that someone who makes a mistake once will repeat it in the future. On this record, however, there was insufficient evidence to establish the alleged bases for jurisdiction. Regarding allegation (C), the evidence *720 was insufficient to establish that, at the time of the hearing, mother's "failing to protect J when mother became *783 aware of the allegations against father" six months earlier exposed J to a "current threat of serious loss or injury that [was] likely to be realized." A. W. , 276 Or. App. at 278, 367 P.3d 556. As for allegation (A), the basis for jurisdiction was that "mother's mental health problems, if left untreated, interfere with her ability to safely parent." It is undisputed, however, that mother's mental health issues were being treated at the time of the hearing-and successfully so. The juvenile court may have been correct that five or six months of successful treatment is not enough to fully resolve mental health issues, but that was not the issue before the court. Complete resolution of mental health issues is not a prerequisite to parenting a child without DHS supervision. The court's conclusory statement that mother's failure to protect J from sexual abuse by father in February was "capable of being repeated, I believe, in relatively short order" is nothing more than speculation on this record. The evidence was not "legally sufficient to permit the trial court to determine that ORS 419B.100(1)(c) was satisfied." Id .
Finally, we briefly address the dissent. On a single occasion, mother recognized but failed to adequately protect J from a very specific type of serious harm, due in part to her untreated mental health condition and her own history of that exact type of harm. The dissent takes that basic fact, couples it with an express assumption that all young children are inevitably exposed to unidentified "dangerous situations," 292 Or. App. at 730, 425 P.3d at 788 (Hadlock, P. J., dissenting), and concludes that there was sufficient evidence to assert jurisdiction over J because mother's mental health condition, although now treated, interferes with her ability to recognize danger to J and prevent danger of any kind to J in general . Even if one accepts the dissent's premise that it is largely irrelevant what DHS argued to the juvenile court or on what bases the juvenile court asserted jurisdiction, the record simply cannot support the dissent's theory of the case.[5]
Reversed.

Due to the record's silence as to what J told mother, it is also unclear how likely it appeared to mother that further abuse would occur if not reported immediately.

When asked her opinion of how she was doing with her mental health treatment, mother responded, "I think I'm doing really good. I know I need to still engage it, but I'm not depressed. I don't have anxiety. And I think it's because I'm engaged. So I think if I stopped, then maybe I'd have issues, but right now, I don't have any." Mother then reaffirmed that her engagement included medication and regular counseling. A few minutes later, in the context of discussing a text message exchange with grandmother in June, mother was asked whether her mental health was still in the process of improving. She eventually answered, "No, I'm good. I mean, obviously, if I stop. I won't you know. But I'm not going to stop. I'm going to continue my therapy. I'm not depressed. I don't think about killing myself. Like I'm in a really good place, and I've worked really hard to get to where I am. And [grandmother] doesn't understand that." (Emphasis added.) The dissent focuses on mother's statement, "No, I'm good," and characterizes that testimony as mother having "denied that she had ongoing mental health issues." 292 Or. App. at 727-28, 425 P.3d at 786-87 (Hadlock, P. J., dissenting). The dissent then concludes that the court could "infer from that evidence that mother's mental health struggles continued in ways that mother did not appreciate." Id . at 729-30, 425 P.3d at 788 (Hadlock, P. J., dissenting). Given the questions that mother was asked and the context of her responses, we disagree that that is a reasonable inference to be drawn from that response. In any event, there is no evidence that any lack of complete insight into the complexities of mental health on the part of mother created or contributed to a threat of serious loss or injury to J.

Regarding allegation (A), the petition originally alleged that "mother's mental health problems interfere with her ability to safely parent," but the parties later stipulated to the court modifying that allegation to include "if left untreated."

We disagree with the dissent's position that the harm at issue was a more generalized inability of mother to recognize danger to J and protect her from it. Jurisdictional basis C, failure to protect, was specifically limited to sexual abuse by father. As for jurisdictional basis A, mental health, there was evidence that mother's own past sexual abuse made it more difficult for her to respond appropriately to J's disclosure of sexual abuse by father. There was no evidence, however, that mother's mental health conditions-depression and anxiety-caused her to be unable to recognize abuse, sexual or otherwise; indeed, it is undisputed that she immediately recognized that J was disclosing sexual abuse. Nor was there any evidence that mother's mental health conditions affected her ability to respond to threats to J other than sexual abuse.
Nonetheless, in its brief on appeal, the state summarily asserts in support of the jurisdictional judgment that mother is "unable to recognize evidence of domestic violence in her current relationship." DHS did not allege domestic violence as a basis for asserting jurisdiction over J, and there is no evidence that J was ever exposed to domestic violence, let alone that J was abused, in mother's home. When the state began questioning mother about domestic violence at the hearing, her attorney objected, and the juvenile court allowed the questions only for one limited purpose: as evidence of mother's own "victimology," as an aspect of her mental health, because there "is a whole dynamic associated with people [who] are victims of domestic violence." Otherwise, the court stated that it was "not worried about her domestic violence" and did not "care whether it is domestic violence." In response to questioning, mother denied that her boyfriend was violent, but she acknowledged that she had previously said yes when asked if he had ever ripped an article of clothing off her. The only other testimony regarding domestic violence was testimony by Fessler that, although DHS was not concerned about domestic violence when it filed the jurisdictional petition, one reason that it was reluctant to return J to mother was a "very recent" concern that mother does not "recognize" domestic violence. In context, it is clear that what Fessler meant is that mother did not agree with Fessler's definition of domestic violence. We ourselves have recognized that there is no single definition of "domestic violence." Dept. of Human Services v. J. J. B. , 291 Or. App. 226, 233, 418 P.3d 56 (2018). In any event, we disagree with the dissent's apparent view that the state's "very recent" "concerns" that mother does not agree with the state's definition of "domestic violence" provides support for its jurisdictional case.

Moreover, the dissent acknowledges that we are bound by the trial court's fact findings, but it fails to explain why, when the court has expressly or implicitly treated a factual dispute as irrelevant, we are permitted (or, in the dissent's view, even obligated) to make fact findings on those issues ourselves to reach an affirmance. For example, the dissent essentially finds that mother's text message to grandmother in June reflected suicidal ideations rather than a typo, 292 Or. App. at 729-30, 425 P.3d at 787-88 (Hadlock, P. J., dissenting), and that mother is a current victim of domestic violence, 292 Or. App. at 732, 425 P.3d at 789 (Hadlock, P. J., dissenting), both disputed issues that the trial court did not resolve, expressly or implicitly, because it viewed them as irrelevant to jurisdiction.