No. 202		March 12, 2025		587

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

In the Matter of T. C. M.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

S. J. M. A.,
*Appellant.*

Jackson County Circuit Court
24JU00050; A184583

David G. Hoppe, Judge.

Argued and submitted December 6, 2024.

Sarah Peterson, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Shannon Storey, Chief Defender, Juvenile Appellate Section, Oregon Public Defense Commission.

Emily N. Snook, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Ortega, Presiding Judge, Hellman, Judge, and Mooney, Senior Judge.

ORTEGA, P. J.

Reversed.

## ORTEGA, P. J.

Mother appeals the juvenile court's judgment asserting dependency jurisdiction over her 12-year-old daughter, T. Mother challenges all three jurisdictional bases, arguing that the Department of Human Services (DHS) failed to prove that the circumstances at the time of trial exposed T to a current risk of serious loss or injury that is likely to be realized in the absence of dependency jurisdiction. While mother admits that she failed to protect T after a disclosure of sexual abuse a year before the jurisdictional trial, at the trial itself mother asserted that she would believe T in the event of another disclosure in the future, that she would refuse T's abuser (mother's husband, who was in jail at the time of the jurisdictional hearing) entrance into her home, and that she intended to file for divorce. We conclude that the state failed to establish a current risk of harm to the child that did not rely on speculation and, accordingly, we reverse.

In reviewing a jurisdictional judgment, we determine whether the record permitted the juvenile court to conclude "that the child's condition or circumstances gave rise to a current threat of serious loss or injury to the child and that there is a reasonable likelihood that the threat will be realized." *Dept. of Human Services v. N. P.*, 257 Or App 633, 639, 307 P3d 444 (2013) (internal quotation marks omitted). "We view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the juvenile court's disposition and assess whether, when so viewed, the record was legally sufficient to permit the outcome." *Dept. of Human Services v. T. L. H. S.*, 292 Or App 708, 709, 425 P3d 775 (2018). The following facts are stated in accordance with that standard.

In January 2023, mother and her then-boyfriend, Antonio, moved in together. Shortly thereafter, Antonio sexually abused T. While the three were sleeping in the same bed, he reached across mother, who was sleeping between the two of them, and placed his hand under T's shirt to grope her chest. The next day, T told mother about the interaction. According to T, mother looked worried and asked T if she should talk to Antonio about it, and T expressed that she

did not want mother to do so. Mother also asked, "Were you dreaming though?" When additional incidents of abuse happened after that exchange, T did not disclose them to mother.

T told two other adults about that initial incident, both of whom expressed concern to mother. T told Miriam, who was a daycare client of mother's and the mother of one of T's friends, the same day she told mother.[1] Miriam spoke with mother about it the following day. Miriam testified that mother "was surprised by it, but she also said that *** [T] had mentioned it to her. *** [S]he also didn't really know whether [T] was being truthful about it because of the fact that she wasn't really sure whether or not she was awake or asleep." According to Miriam, mother said that she tried talking to T, but T did not want to talk about it again.

T also told her paternal aunt Maura, who (with her husband) had introduced Antonio to mother, about the initial instance of abuse. Like Miriam, Maura talked to mother about it, emphasizing that Antonio was dangerous, and that mother needed to be careful to protect T. Maura testified that mother did not know what to do because T did not want to talk about it. Mother married Antonio in April 2023, about three months after that first incident of abuse.

Nearly a year after the initial disclosures, T travelled to Mexico to visit father and his family and, while there, she disclosed to Maura other instances of Antonio's abusive behavior. T said that, throughout the year, Antonio had touched her on her private parts, cornered her and breathed heavily into her ear, and required her to study in the middle of the night because she had poor grades. During that time, T was not eating well and was losing weight. She told her aunt that she did not eat because she did not want to live anymore. According to Maura, when Maura and father called mother to express concern about what T had disclosed, mother said that T was lying. T expressed that she was scared to return home and that she wanted to stay in Mexico. Mother responded that T would no longer be her daughter if she chose to stay in Mexico.

_____

[1] Miriam's own daughter, who attended daycare at mother's home, is the other child victim in Antonio's pending criminal case, related to an incident that came to light some months later.

When T returned from Mexico, Antonio was present in mother's home. Maura had made a report to DHS, and police officers removed T from the home. In the course of T's removal, mother was crying, would not allow T to hug her, and made comments insinuating that it was T's fault that she would lose her daycare business. Mother also told T to lie about the fact that Antonio was still living with them. T complied with that directive in the first forensic interview, but later confessed that she had lied because mother had asked her to and because T was scared of Antonio, who she believed had told her mother to instruct T to lie. Upon removal, T was placed with Maura, where she remained until the jurisdictional hearing, which was held about four months later, in May 2024.

DHS alleged the following jurisdictional bases:

"(4A)   [M]other *** failed to, is unable to, is unwilling to, and cannot provide adequate supervision of the child that placed the child at risk of harm;

"(4B)   [T] told her mother than Antonio *** was sexually abusing her and mother continued to allow contact between [T] and that person;" and

"(4C)   M]other failed to provide [T] with the care, guidance, and/or protection necessary for the physical, mental, and/or emotional well-being of the child."

Three central witnesses at the jurisdictional hearing—mother, Maura, and Miriam—relied on an interpreter to testify and participate in the proceedings. Mother speaks only Spanish. Keeping in mind our standard of review and the deference owed to the trial court, we are obliged to consider with care what derivative inferences are permissible regarding the tone, demeanor, or behavior of a non-English-speaking mother as she testifies with regard to her fundamental right to parent her child. *See Dept. of Human Services v. D. M.*, 248 Or App 683, 688, 275 P3d 971 (2012) (A parent's behavior must be sufficient to "justify state intervention into a parent's fundamental right to the care, control, and custody of her children."). We defer to the trial court's permissible derivative inferences, which may be based on a witness's presentation, but also understand that cultural context complicates that endeavor. We have

reviewed mother's testimony and the court's conclusions bearing that in mind.

The question for the juvenile court in determining whether jurisdiction was warranted under ORS 419B.100(1) (c) was whether the evidence of T's "condition or circumstances" *at the time of the jurisdictional hearing* established "a current threat of serious loss or injury" to T that was reasonably likely to be realized without juvenile court intervention. *Dept of Human Services v. M. A. H.*, 272 Or App 75, 84, 354 P3d 738 (2015) (internal quotation marks omitted). By that time, Antonio was in jail facing an array of charges.[2] Further, mother was no longer expressing doubt about whether T had experienced abuse. She testified that she "made a mistake" by not believing her daughter and intervening. She also said that if T had told her of another instance of abuse, she would have believed her: "She didn't tell me again. Otherwise, I would not have allowed it. She's my only daughter. She's my life. Of course, I would not have allowed that *** this type of abuse would have continued." Mother stated that she had not had any contact with Antonio and that she planned to file for divorce. When asked if she would call the police if Antonio showed up at her door, mother responded that she would, "[b]ecause [T] is first."

Both mother and Maura testified to Antonio's reputation in their community. Maura and her husband introduced mother to Antonio. Maura was aware of the previous sex offense charges against Antonio, but she noted that "everybody at the church said that he hadn't done that— that he was innocent." When asked why mother was not concerned about having Antonio around children, mother reiterated that they went to church and everyone there knew him. She thought he was innocent of the pending charges (which she testified she learned about after she married him) because he was only accused, not convicted. Mother testified that, even though Antonio's case involving T had not yet been proven, she "would not believe him anymore."

---

[2] Along with charges related to sexual abuse of T and another child, Antonio currently faces charges for first-degree kidnapping, first-degree sexual abuse, attempted first-degree rape, and public indecency from an unrelated 2020 case involving an adult victim that remains open.

Mother had not yet completed non-offending parenting classes because DHS had not yet located a class that was fully in Spanish, but mother completed an evaluation at Options Counseling and contacted La Clinica for a mental health evaluation. She also supported T's involvement in therapy and expressed that she was proud of T for improving her grades and proud that she was doing better.

At times in her testimony, mother resisted taking responsibility for the harm her daughter experienced, saying, "How was I going to *** know *** that it was going to continue or that it could have been true?" She said, "I love [T] with all my heart. But you don't know how much she has hurt me." She also noted that the other two adults to whom T had confided about the first incident "didn't do anything" at the time of T's first report either.

The judge upheld DHS's jurisdictional bases, and offered the following reasoning:

> "I believe that the allegations have been proven. I believe listening to the testimony of all the witnesses, specifically including [m]other and her demeanor and behavior, this is not about the limitations imposed because of Spanish-speaking in relation with classes or engaging with her attorney or the services offered.

> "It has to do with, I believe, that there still is a current threat of harm. We don't know what's going to happen in the criminal case. The other one's been open for nearly four years. He's posted bail before and got out. And, like I said, based on her responses here on the stand, I don't believe that *** those have been ameliorated, those concerns."

Mother appeals the trial court's judgment establishing jurisdiction over T.

As noted, the juvenile court may assume jurisdiction over a child under ORS 419B.100(1)(c) when the child's condition or circumstances are such as to endanger the welfare of the child "*at the time of the jurisdictional hearing.*" *M. A. H.*, 272 Or App at 84 (emphasis in original). A child's condition or circumstances "endanger" the child within the meaning of the statute if they "'create a current threat of serious loss or injury to the child,' and the threat is one that

is 'reasonably likel[y]' to be realized absent juvenile court intervention." *Id.* (quoting *Dept. of Human Services v. S. P.*, 249 Or App 76, 84, 90-91, 275 P3d 979 (2012)). DHS has the burden of presenting evidence that establishes "a nexus between the parent's allegedly risk-causing conduct and the harm to the child." *T. L. H. S.*, 292 Or App at 714.

Here, it is undisputed that mother failed to intervene and protect T from Antonio after T's disclosure, which led to T experiencing further abusive behavior from Antonio over the course of the ensuing year. Had DHS intervened at the time of T's first disclosure, the requisite current risk of harm that was reasonably likely to be realized likely could have been established. However, the question at issue is whether, at the time of the jurisdictional hearing—more than a year after T's initial disclosure, four months after T's removal, and after Antonio's subsequent incarceration—T's conditions and circumstances presented a *current* threat of serious loss or injury to T that was reasonably likely to be realized. That standard was not met on this record.

When evaluating whether there is sufficient evidence of a current risk of harm, we must distinguish between reasonable inferences from the evidence and impermissible speculation. "The threat of serious harm to the child *** cannot be speculative. Rather, 'there must be a reasonable likelihood that the threat will be realized.'" *Dept. of Human Services v. M. Q.*, 253 Or App 776, 785, 292 P3d 616 (2012) (quoting *Dept. of Human Services v. A. F.*, 243 Or App 379, 386, 259 P3d 957 (2011)). In this case, the trial court's determination that the risk of harm to T caused by mother's failure to act protectively was current at the time of the jurisdictional hearing required impermissible speculation. Antonio was in jail at the time of the hearing, and there was no evidence as to a pending release. Mother testified that she would act protectively and that she would not allow contact with Antonio. The court's conclusion that mother's failure to protect T from Antonio was a current threat that was reasonably likely to be realized required the court to speculate that Antonio would make bail[3] and that he would

---

[3] The court referenced that Antonio had previously made bail for his prior 2020 charge at $1,000,000. Bail is currently set for $500,000 for the related criminal case, and $1,750,000 for the 2020 criminal case.

make contact with T. On this record, that line of reasoning is not based on permissible reasonable inferences. In addition, in this context, the court's unexpressed (but implicit) disbelief of mother's testimony that she did not want contact with Antonio, would not allow him in her home, and would act protectively of T was not sufficient on its own to take jurisdiction in this case, because disbelief of mother does not equate to affirmative evidence upon which the court could make an opposite inference. *See Dept. of Human Services v. M. Q.*, 253 Or App 776, 786 292 P3d 616 (2012) (finding a witness's testimony to be not credible does not provide affirmative evidence of the opposite (relying on *State v. Reed*, 339 Or 239, 245, 118 P3d 791 (2005))). We also observe that the court's expression of its reasons for taking jurisdiction was grounded in its determination that mother had not ameliorated the allegations in the petition, not that the court completely disbelieved mother's ability to be protective of T such that there was a current risk of harm to T. Focusing on the standard for jurisdiction, the record in this case was insufficient.

Our conclusion here is consistent with how we have approached similar issues in other cases with arguably more concerning facts. In *T. L. H. S.*, we concluded that the father's no-contact order and the mother's plan to petition for custody rendered father "out of the picture," which contributed to the conclusion that the child's circumstances had substantially changed by the time of the jurisdictional hearing. 292 Or App at 719; *see also Dept. of Human Services v. M. E.*, 255 Or App 296, 312, 297 P3d 17 (2013) (on *de novo* review, reversing juvenile jurisdiction based on the mother's failure to protect her daughter from her stepfather's sexual abuse, where the court found that the stepfather was not a threat for future abuse, even though mother still did not believe daughter's allegations at the time of the hearing). Given Antonio's incarceration, mother's adamance that she did not want contact with him, and the lack of any evidence of such contact, DHS failed to establish a nonspeculative current risk of harm to T based on mother's failure to protect T from Antonio. Thus, there was insufficient evidence to uphold the jurisdictional bases, and the trial court erred.

To the extent that DHS argues that mother's other conduct created a risk of serious loss or injury to T—*i.e.*, mother refusing to hug T at the time of her removal or her comments on the stand deflecting blame onto T and others—we are not persuaded. DHS did not present sufficient evidence of a risk of "serious loss or injury" attributable to mother's aloofness in a moment of crisis or her attitude toward T. *Cf. M. E.*, 255 Or App at 313 ("[T]he state failed to present any evidence as to the nature of the physical or emotional injury that M. A. was reasonably likely to suffer because of mother's negative comments."). To the contrary, T testified that she wanted to return home to mother, and Maura testified that mother has always been a doting and loving parent. T attributed her weight loss and poor performance in school, both occurring before any negative comments by mother, to Antonio's abusive behavior. Since removal, both T and Maura testified that T has improved her grades, is eating well, and seems altogether happier. The record before us does not support the conclusion that mother's behavior toward T created a current risk of serious loss or injury sufficient to justify jurisdiction.

Reversed.