392 January 7, 2026 No. 3

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

In the Matter of A. L. G.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

K. G.,
*Appellant.*

Coos County Circuit Court
24JU02291; A186557

Matthew P. Muenchrath, Judge.

Submitted July 28, 2025.

Shannon Storey, Chief Defender, Juvenile Appellate Section, and Elena C. Stross, Deputy Public Defender, Oregon Public Defense Commission, filed the briefs for appellant.

Dan Rayfield, Attorney General, Benjamin Gutman, Solicitor General, and Shannon T. Reel, Assistant Attorney General, filed the brief for respondent.

Before Aoyagi, Presiding Judge, Egan, Judge, and Pagán, Judge.

EGAN, J.

Affirmed.

**EGAN, J.**

In this juvenile dependency case, father appeals from the juvenile court's judgment asserting dependency jurisdiction over father's teenage daughter, L. The juvenile court stated three bases for its assertion of dependency jurisdiction: (1) father's lack of contact with L for the past thirteen years and not serving as a parental resource to the child since she was two years old, and that placement with father will create a serious risk of emotional or psychological harm to her; (2) father is "unable to be a custodial resource;"[1] and (3) father's mental health problems interfere with his ability to safely parent and create a risk of harm to L. In four assignments of error, father challenges each of the three jurisdictional bases and the overall assertion of jurisdiction, arguing that the Oregon Department of Human Services (ODHS) did not meet its burden to prove a current risk of harm to L. ODHS responds that the juvenile court did not err in finding that, under the totality of the circumstances, as to each of the jurisdictional bases, ODHS proved a current risk of harm to the welfare of the child. Ultimately, we agree with the juvenile court that ODHS met its burden to prove a risk of serious loss or injury to L arising out of the alleged conditions and circumstances related to father. Accordingly, we affirm.

## STANDARD OF REVIEW

In reviewing the juvenile court's assertion of dependency jurisdiction, we view the evidence, including permissible derivative inferences, in the light most favorable to the trial court's disposition to assess whether the record was legally sufficient to permit the assertion of dependency jurisdiction. *Dept. of Human Services v. N. P.*, 257 Or App 633, 639-40, 307 P3d 444 (2013). We state the facts in accordance with that standard.

---

[1] We acknowledge, as the parties do, that the juvenile court included the phrase, "father is unable to be a custodial resource," in its explanation of both the first and second jurisdictional bases. We have omitted that phrase from our explanation of the first basis, finding it superfluous to the trial court's analysis of that issue, which is focused on the risk of emotional or psychological harm created by the unfamiliarity between L and father resulting from prolonged lack of contact.

BACKGROUND

When L was approximately two years old, father and mother ended their relationship, and mother obtained a protective order against father. For the next thirteen years, father had no contact with L. Throughout those years, father lived without housing and suffered mental health problems, including depression. Father testified that he had been living without housing so that he could be free to go to his children if ever they needed him. Meanwhile, in the care of mother, L experienced extensive physical, emotional, and sexual abuse, and other forms of mistreatment. Father knew of instances of abuse soon after he and mother had separated but did not intervene or report the abuse to authorities.

Due to the severity of abuse and neglect L experienced, she suffers from a heightened state of emotional instability, requiring informed and skilled caregiving. L's school-based mental health therapist, whom L worked with on both a group and an individual basis, diagnosed L with Generalized Anxiety Disorder arising out of complex trauma. Additionally, her therapist testified that L scored ten out of ten on the Adverse Childhood Experiences Survey (ACES), the highest the therapist had ever personally seen. Such a score indicates an extreme risk for negative outcomes in life if the child is not provided proper support.

In April 2024, ODHS filed a dependency petition concerning L and removed her from mother's home because their relationship had deteriorated and because L did not feel safe at home, having experienced years of abuse by mother and others living there. L was placed with a resource family in Bandon, Oregon, where she had been living with mother and where she had an established support network, including her therapist.

When ODHS originally filed its dependency petition, father's whereabouts were unknown. However, within a few months, ODHS found father living in Cottonwood, Arizona. Beginning in the summer of 2024, ODHS made efforts to reestablish a relationship between father and L by arranging phone calls and one in-person meeting between L and

father. Many of the phone calls ended with father getting frustrated and sometimes yelling and hanging up on ODHS officials. During a phone call in late July or early August, L attempted to read father a letter expressing her desire to remain in her resource home and not to move in with father. Father raised his voice, and an argument ensued between father and L. Following that incident, L wished to cease further visits with father until she was older and felt more stable, a preference she reiterated at trial.

The jurisdictional trial was held in November 2024. By the time of trial, father had returned to Oregon and was living in Charleston, where he had leased space in an RV park with a friend from Cottonwood. Father proposed to care for L in Charleston, away from her current school, therapist, and social network in Bandon. Father indicated that L would sleep in a bunkbed in the RV with a curtain for privacy. At the trial, L again expressed her desire to cease further visits with father until she was older. In fact, L testified that father's actions and mannerisms—that he was quick to anger, yelled often, and reacted to conflict with volatility—triggered her feelings of unsafety and that she would run away if placed with him.

At trial, L's therapist praised L's impressive resiliency given all that she has experienced but warned that L was at severe risk of significant regression in her mental health if her supportive care and social network were disrupted. L's counselor explained that circumstances that may to an observer appear minor can be significant triggers for individuals, like L, who have experienced a lifetime of complex trauma. For example, during the in-person meeting between L and father, the only time the two had ever met in person, father reached out and hugged L without asking. L's counselor explained that such touch from men who are strangers can be a significant trigger for someone like L. Indeed, L testified to having been very uncomfortable after that meeting with father and having felt as though she could not refuse father's hug even though she didn't want to be touched by him.

At the conclusion of the trial, the court asserted dependency jurisdiction over L on the following bases:

(1) "The father has had no contact with the child for a substantial period of time, has not been a parental resource to the child, and placement with the father would cause serious emotional or psychological harm to the child;" (2) "the father is unable to be a custodial resource:" and (3) "the father's mental health problems interfere with his ability to safely parent the child and place the child at risk of harm."

On appeal, father argues that ODHS failed to establish that any of the alleged bases for jurisdiction created a current, nonspeculative risk of harm to L. Additionally, father argues that ODHS failed to prove that he was unable to be a custodial resource, given that he is present in Oregon, has secured housing, is not incarcerated or legally blocked from caring for L, and wishes to provide such care. Finally, father argues that—beyond his admission to struggling with depression—ODHS failed to establish by competent evidence that he suffered from mental health problems that endangered L. Therefore, father argues that the juvenile court erred in asserting dependency jurisdiction. ODHS responds that each of the allegations are supported by the evidence and that the juvenile court correctly asserted jurisdiction after concluding, under the totality of the circumstances, that there was a reasonable likelihood of serious harm to L in father's care.

## ANALYSIS

Under ORS 419B.100(1)(c), juvenile courts may assert jurisdiction over a minor "whose condition or circumstances are such as to endanger the welfare of the [child] or others." There must be evidence that the "child's condition or circumstances endanger the welfare of the child" by creating a "current threat of serious loss or injury." *Dept. of Human Services v. C. J. T.*, 258 Or App 57, 61, 308 P3d 307 (2013).

In making its determination, the juvenile court must decide whether, "*under the totality of the circumstances*, there is a reasonable likelihood of harm to the welfare of the child" arising out of the alleged facts. *Id.* (emphasis added); *see also State ex rel Juv. Dept. v. Smith*, 316 Or 646, 653, 853 P2d 282 (1993) ("If, after considering all the facts, the

juvenile court finds that there is a reasonable likelihood of harm to the welfare of the child, the court may take jurisdiction."). ODHS, as the petitioner, must establish "both that the child is at risk of a certain severity of harm and that there is a reasonable likelihood that the risk will be realized." *Dept. of Human Services, v. S. D. I.*, 259 Or App 116, 121, 312 P3d 608 (2013); *see also C. J. T.*, 258 Or App at 62 ("[ODHS] has the burden to demonstrate a nexus between the allegedly risk-causing conduct and the harm to the child."). While the alleged risk of harm cannot be merely speculative, "a condition or circumstance * * * may be found harmful by reason of creating a harmful environment for the child." *Smith*, 316 Or at 653. Importantly, "[t]he focus of the jurisdictional inquiry is the *child's* condition or circumstances." *State v. S. T. S.*, 236 Or App 646, 654, 238 P3d 53 (2010) (emphasis in original); *see also Dept. of Human Services v. T. L. H. S.*, 292 Or App 708, 715, 425 P3d 775 (2018) ("Juvenile dependency proceedings are not punitive in nature. Their sole purpose is to protect the child.").

In evaluating the totality of L's conditions and circumstances, the juvenile court, based on the testimony of L's school therapist, focused on the "very acute mental health needs that make [L] particularly vulnerable and at risk of significant regression that are way beyond those of a 'normal teen.'" While we understand L's mental health needs and vulnerability to be quite normal for a teen with such traumatic life experiences, the juvenile court was correct to assess the circumstances of this case with L's particular needs in mind.

First, the juvenile court determined that there was a risk of harm to L's welfare because of father's absence and unavailability as a parent for the past 13 years. From L's perspective, father is a stranger. Because of her experiences, L is mistrustful of and easily triggered into emotional regression by strange men and volatile behavior. As her therapist testified, L requires a great deal of stability in her familial interactions. In ODHS's attempts to reunite father with L, father revealed significant emotional instability that caused harm to L. When L expressed her desire to remain with her resource family, father became dysregulated and yelled at

her. An argument ensued and the encounter ended abruptly with L emotionally shaken. After that encounter, L clearly expressed that she does not wish to live with father, or even to continue communications with him, and has unequivocally stated her intention to run away if she is placed in his care. *See Dept. of Human Services v. A. H.*, 316 Or App 126, 127, 500 P3d 770 (2021) (finding evidence sufficient to prove requisite risk of harm when a child had previously run away and threated to do so again if returned to mother's care).

Based on the record, there is reason to believe that L would follow through with her threat to run away from father, a man she hardly knows, to try to reunite with the resource family with whom she feels safe. The juvenile court determined that "[when L] runs away from [father,] it would pose a severe and nonspeculative risk to her safety when considering the totality of circumstances." Even short of running away, the juvenile court found that L "has already been traumatized by Father during their very limited contacts" during ODHS's attempts to reunite her with father and that such harm would continue if L were placed with father. We agree with the juvenile court and conclude that the juvenile court did not err in determining that ODHS proved the requisite risk of harm to L arising out of father's lack of relationship with L for most of her life.

Second, we understand the court to have found that father was "unable to serve as a custodial resource" because he is unable to provide the type of stable and secure living arrangement that L requires due to her own vulnerability. The court expressed its lack of confidence that father would continue mental health services for L, seek resources to address his parenting deficits, avail L of her current support network, or effectively and safely parent L. The juvenile court found, based on the testimony of L's school therapist and ODHS officials, that removing L from her current school, therapist, and social network in Bandon would leave her at risk of significant regression in mental health and very likely escalate to severe emotional harm. Additionally, based in part on father's historical circumstances, the juvenile court lacked confidence in the permanence of father's living arrangement. The juvenile court acknowledged that

housing insecurity is not a test of a parent's ability to safely parent a child. However, the court found father's plan inadequate and unstable, creating further risk of harm to L. We conclude that the juvenile court did not err in its determination, under the circumstances of this case, that father is unable to be a custodial resource to L without a current risk of harm to her.

Finally, the juvenile court determined that father's mental health problems prevent him from safely parenting L. Father argues, in part, that the record did not contain sufficient evidence to link father's statements and behaviors at trial with mental health problems that created a risk of harm to L. Although additional evidence regarding probable mental health diagnoses might make ODHS's case stronger, the lack of it in this case does not render the evidentiary record insufficient to establish that father experienced mental health issues that were seriously harmful to L at the time of the jurisdiction trial.

Father testified to struggling with his mental health every day and that he has been diagnosed with depression that makes it "very difficult to function sometimes." Father has been unmedicated and without mental health care for approximately three years. When asked if depression prevented him from getting out of bed, father said "not anymore [because] four years ago I started pacing relentlessly *** as soon as I wake up in the morning I'm up and pacing from *** the moment I wake up until the damn time I go to bed, I'm pacing." Based on father's testimony, the juvenile court found that father "appeared to have a significant disconnect with reality at times" and that his "fantastical testimony about his long-term, untreated/unmedicated mental health struggles, his claim of being poisoned long ago that still affects his mind, and theories about not seeing with your eyes but with 'your hair and mind'" made it clear to the court that he was unable to relate to and parent a "severely emotionally vulnerable teen daughter."

Further, the juvenile court found that, when father was presented with questions about L's long-term vulnerabilities resulting from abuse, "he displayed a complete lack of understanding." When asked if he understood that L was

mistrustful of strange men because of a history of sexual abuse, father replied that she would have to learn that it's "not every male on the planet—if they have a problem dealing with males that's a problem they have to deal with on their own." The juvenile court found that father seemed to "lack basic empathy and displayed no ability to realistically prioritize [L's] needs over his own to any perceptible degree." The court noted that L "appeared to be in abject shock, horror, and acute fear *** at the prospect of living in his care." Additionally, the court found that father's volatile behavior during calls with ODHS officials and L revealed the harmful impacts father's mental health problems have already had on L's welfare, causing her distress and triggering feelings of unsafety. On these facts, we conclude that the juvenile court did not err in determining that father's mental health problems created a current risk of harm to L's welfare.

The juvenile court found that "it would be severely detrimental to [L] if she were to be removed from her current placement and placed with Father at this time." Having determined that L was at severe risk of current harm resulting from all three jurisdictional bases, the juvenile court asserted jurisdiction. We conclude that the court did not err in doing so.

Affirmed.